```
JOHNSON AND ASSOCIATES
Einar Wm. Johnson   State Bar No. 111105
Sante Fe Business Park
2370 West Carson Street, Suite 141
Torrance, California 90501
(310) 783-0035

Attorneys For Plaintiff
DARTY CRONIN
```



UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARTY CRONIN, | Case No. **SACV 08-01297 DOC (MLGx)** |
| Plaintiff, | COMPLAINT |
| v. | JURY DEMANDED |
| | 1. Fraud Under Commodity Futures Modernization Act of 2000 |
| MONEX DEPOSIT COMPANY, a California limited Partnership, LOUIS CARABINI, MICHAEL CARABINI, MIKE MORONI, DAVID GALA, DAN J. C. WALES, AND DOES 1 - 200 | 2. Common Law Fraud |
| | 3. Breach of Contract |
| | 4. Negligent Misrepresentation |
| | 5. Constructive Fraud |
| Defendants. | 6. Common Count |

Plaintiff alleges as follows:

### JURISDICTION

1. The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1337 and 7 U.S.C. § 1, et seq.

## VENUE

2. Plaintiff is informed and believes, and thereon alleges, that all Defendants reside in this District. In addition, the claim arose in this District.

## PARTY ALLEGATIONS

3. Plaintiff DARTY CRONIN is an individual residing in the County of Los Angeles, State of California ("CRONIN").

4. Plaintiff is informed and believes, and thereon alleges, that Defendant MONEX DEPOSIT COMPANY ("MONEX") is a California limited partnership with its principle place of business in Orange County, California.

5. Plaintiff is informed and believes, and thereon alleges, that Defendant LOUIS CARABINI ("L. CARABINI") is an individual residing in Orange County, California.

6. Plaintiff is informed and believes, and thereon alleges, that Defendant MICHAEL CARABINI ("M. CARABINI") is an individual residing in Orange County, California.

7. Plaintiff is informed and believes, and thereon alleges, that Defendant MIKE MORONI ("MORONI") is an individual residing in Orange County, California.

8. Plaintiff is informed and believes, and thereon alleges, that Defendant DAVID GALA ("GALA") is an individual residing in Orange County, California.

9. Plaintiff is informed and believes, and thereon alleges, that Defendant DAN J. C. WALES ("WALES") is an individual residing in Orange County, California.

10. Plaintiff is not currently aware of the names and/or capacities of the Defendants sued herein as DOES 1 through 200, inclusive, and therefore sue said Defendants by such fictitious names. Plaintiff is informed and believes that said Defendants are responsible in some manner, or culpable for some reason, for Plaintiff's damages and the acts alleged herein. Plaintiff will amend this Complaint to allege the true names and capacities of these Defendants when the same are ascertained. Defendants MONEX, L. CARABINI, M. CARABINI, MORONI, GALA, WALES, and DOES 1 through 200, inclusive, shall be collectively referred to herein as "Defendants".

11. Plaintiff is informed and believe that at all times mentioned herein, each of the Defendants sued herein was an agent, principal, representative, employer, or employee of each of the other Defendants acting within the purpose and scope of such agency, representation or employment, and that each Defendant directed, was aware of, acted upon, ratified, and/or accepted the benefits of the acts and representations of each of the other Defendants. In addition, Plaintiff is informed and believes that

Defendants entered a conspiracy with one another to commit the acts alleged hereinbelow as more fully described hereinbelow.

## INTRODUCTORY ALLEGATIONS

12. Plaintiff is informed and believes, and thereon alleges, that in or before June of 2007, Defendants MONEX, L. CARABINI, M. CARABINI, MORONI, GALA, and WALES and Does 1 through 200, entered into a conspiracy to engage in the silvers futures market, without becoming members of a commission-designated board of trade as required by Federal law, and with the intent to divest investors of their monies for Defendants' personal gain by managing investment accounts for futures contracts in a manner calculated to cause their investors to lose money rather than to help investors realize gains. Plaintiff is further informed and believes, and thereon alleges, that in addition to seeking to have the benefits associated with clientele that were paying fees on transactions, and in addition to seeking to divorce their clientele from their money, that Defendants also devised a scheme pursuant to which they could leverage the monies invested by their clientele to generate profits of their own, including the profits their clientele would otherwise have realized. Plaintiff is further informed and believes, and thereon alleges, that at all relevant times Defendants were in need of substantial cash influx into MONEX by reason of the fact that at all relevant times the Internal Revenue Service was pursuing MONEX for over $378,000,000 in unpaid taxes. Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of them, undertook the acts described herein

in furtherance of said conspiracy.

13. MONEX advertises itself to be a purchaser and seller of precious metals. Plaintiff is informed and believes that this aspect of MONEX' business is simply a front to hide the unlawful and fraudulent activities that are described in this Complaint and to locate members of the general public that can be persuaded to engage in silver futures contracts.

14. In or about June of 2007, CRONIN contracted to purchase precious metals (gold and silver) from MONEX. Plaintiff is informed and believes that he signed a written contract with MONEX relating to standard purchases of precious metals from MONEX and standard sales of precious metals to MONEX, though Plaintiff does not recall doing so. As explained below, said contract, if it exists, is not at issue in this litigation. In the course of purchasing precious metals from MONEX, CRONIN was assigned a MONEX account representative by the name of Sherry Boland ("Boland") and was told that MONEX account representatives were knowledgeable and sophisticated individuals in the precious metals market and that their function was to provide investment strategies to their clientele.

15. In or about June, 2007, in the course of CRONIN's making of some standard purchases of precious metals from MONEX, Defendants learned that CRONIN had significant wealth and was of the class of clientele that Defendants desired to target as a victim of the fraudulent scheme described herein.

16. Accordingly, Boland was assigned to CRONIN's account for the very reason that she was an honest individual with no knowledge of Defendants' fraudulent intentions who was extremely skilled in the precious metals market and whom Defendants knew would instill trust and confidence in CRONIN and guide him in the investment of substantial sums in futures contracts without arousing suspicion as to Defendants' true intent simply to take such funds from him.

17. Plaintiff is informed and believes, and thereon alleges, that Defendants intentionally suppressed the following material facts from Sherry Boland so that she would unwittingly act as Defendants' agent in suppressing material facts from CRONIN and other MONEX clientele: A) That MONEX was engaged in a futures contract business that required that it be registered on a commission-designated board of trade under federal law, B) that the "short" investment program described below was of a nature that required registration on a commission based board of trade under federal law, C) that it was Defendants' actual intent not to assist their clients to realize profits but was, instead, their intent to steal their clients' money through fraud, deception, and unlawful acts, D) that Defendants intended to maneuver "short" transactions in a manner calculated to cause their clientele to lose money, and E) that Defendants would utilize their clients' monies procured through the "short" investment program in a manner so as to realize profits of their own at the expense of their clients, including profits their clients would otherwise have realized. These suppressed facts shall hereinafter be referred to as the

"Suppressed Facts".

18. Within a short time after CRONIN had made some standard purchases of precious metals from MONEX, he was advised by Sherry Boland, about a completely different MONEX program that had nothing to do with the conventional purchase and sale program that CRONIN started out with. Defendants represented to CRONIN, through their unwitting agent, Sherry Boland, that this different program would permit him to make a profit by selling silver when the price of silver was declining in the market with the aid of his account representative. This program was referred to as "going short". It was represented to CRONIN by Defendants, through Bolin, that in a "short" transaction he would commit to MONEX to sell silver at a specified price and in a specified quantity, but with a deferred consummation date and that under this program MONEX would assure CRONIN that it would arrange and assure the purchase of the silver at that price through an undisclosed purchaser and that at any given time in the future that CRONIN determined to buy the silver to cover the sale MONEX would produce a seller at the then existing market price. Accordingly, on a date certain CRONIN could lock in a sales price for silver at the then prevailing rate in a specified amount, but without having to cover the sale at that time, and could buy the silver to cover the sale at a future time of his own choosing at the market rates prevailing at the time of the election. Thus, if the price of silver went down after the commitment to sell CRONIN would make a profit based on the "bet" that the price of silver would drop. If the price of silver increased above the committed sale price CRONIN could lose money if

the market trend did not reverse and decline once again. CRONIN is informed and believes that Sherry Boland was authorized by her superiors at MONEX to offer this program to CRONIN, and to make the foregoing representations regarding it, and that she was given authority to enter into an oral agreement with CRONIN with regard to the program.

19. The means through which MONEX could permit this program to operate are unknown to CRONIN as they were never explained to him. Only the concept that CRONIN could make a profit in a declining silver market on the terms just described was explained and represented and that this would ultimately be accomplished by MONEX guarantying to produce a buyer at the locked in sales price and a seller of the silver necessary to back CRONIN's prior "sale" from which CRONIN could purchase the silver to cover the sale at less than the sales price if the market declined. Plaintiff is informed and believe that to make this program work MONEX would have to have offsetting "long" transactions to balance the "short" transactions and that the "long" offsets were either from commitments of other MONEX customers or were the commitment of MONEX itself without the silver bullion to back it up. Indeed, Plaintiff is informed and believes that with regard to all short transactions he entered with MONEX pursuant to the oral agreement described below, that there was no physical transfer of silver from seller to buyer (and that there was no intent that actual physical delivery of silver would occur) and that a "short" transaction was either literally a paper transaction with no silver to back it or was for all practical purposes strictly a paper transaction the value of which turned on

the outcome of "betting" on market trends over time rather than in the value of the commodity in a straight forward purchase and sale.

20. In summary, at least the following misrepresentations were made to CRONIN by Defendants through their unwitting agent Bolin: 1) that MONEX was offering CRONIN an opportunity to make a profit in a declining silver market when they harbored the opposite intent, 2) that MONEX would provide a sound investment strategy, designed to make his investments profitable, through the account representative assigned to CRONIN (this statement was true with regard to Boland but was not true with regard to the intended future account representative to be assigned to CRONIN under the bait and switch described below), 3) that MONEX would act consistent with the terms of the program as outlined above, and 4) that in all respects Defendants' had CRONIN's interests at heart. These misrepresentations shall hereinafter be referred to as the "Initial Misrepresentations".

21. Based on the Initial Misrepresentations and without knowledge of the Suppressed Facts, CRONIN decided he wanted to invest in "short" transactions with MONEX and to enter an agreement with MONEX to that effect and so advised Sherry Boland. Boland orally agreed to entry of such an agreement on behalf of MONEX resulting in the formation of an oral agreement between MONEX and CRONIN whereunder CRONIN could invest in silver futures ("Futures Contract"). The terms of the Futures Contract, express and implied, were as follows: 1) CRONIN's account would be managed by an account representative who would formulate and provide to CRONIN an

investment strategy - - i.e., whether to make conventional purchases and sales of silver or whether to invest his monies in the "short" transaction format wherein he could speculate as to whether the price of silver would drop and profit if it did drop, 2) the account representative managing his account would be more sophisticated than CRONIN with silver investments in general and, more particularly, in market trends, and would have CRONIN's best interests at heart, 3) that MONEX, through its sole efforts outside of the control of CRONIN, would guaranty that at any point in time that CRONIN decided to make the "purchase" to offset the "sale" in a "short" transaction there would be a seller available for CRONIN to buy at the then prevailing market rates which would then be matched against his sell commitment - - thus MONEX assured CRONIN that through its efforts CRONIN would be able to sell high and buy low if the silver market dropped through this deferred form of transaction, and 4) that CRONIN would go "short" with the intent of making a profit based on pure speculation as to fluctuations in the price of silver subject only to the risk that silver market rates might rise instead of fall. Implied within this oral agreement was a covenant of good faith and fair dealing wherein MONEX agreed that it would do nothing to deprive CRONIN of the benefit of his bargain, including by avoiding the making of statements that were calculated to cause CRONIN to lose money so that Defendants could enrich themselves. Such terms were applicable as to all of the specific investments CRONIN would make under the program. ("Futures Transactions").

22. Consistent with Defendants' plan to deceive CRONIN, Boland

had CRONIN's interests at heart in managing his account and he gained trust and confidence in dealing with MONEX as a consequence. CRONIN entered Futures Transactions pursuant to the Futures Contract and made a profit by following Boland's investment strategy in this regard. Over time CRONIN invested millions in Futures Transactions. Plaintiff is informed and believes, and thereon alleges, that Defendants also assigned Boland to other substantial accounts with clientele that had substantial monies, also with the intent of building their faith and confidence and investment outlay, and then terminated Boland on or about July 18, 2008. By terminating BOLAND Defendants would be free to acquire control over CRONIN's "short" investments and to persuade him to abandon those investments in favor of conventional purchase of silver all as further set forth herein.

23. Plaintiff is informed and believes that at all relevant times L. CARABINI and M. CARABINI supervised and controlled the actions of MORONI who was the Vice President of MONEX, that as Vice President MORONI was involved in management at MONEX and had been one of the individuals that ultimately supervised Sherry Boland and other account representatives. On or about July 18, 2008, MORONI represented to CRONIN, in substance, that Sherry Boland would no longer be handling CRONIN's account but that CRONIN should not be concerned because WALES was being assigned to his account and that WALES was the best account representative that MONEX had and that he had more expertise and sophistication in silver investments than CRONIN and that CRONIN could, and should, trust WALES' statements to CRONIN. MORONI further represented to CRONIN that WALES knew

CRONIN's account and wanted to take care of it and that WALES got all of the big accounts like CRONIN's. CRONIN did not know WALES and accepted, as true, MORONI's representation. MORONI also suppressed the fact that Boland had been terminated by MONEX - - a fact which would have proved highly relevant to CRONIN given his trust and confidence in Boland. ("MORONI Misrepresentations and Suppression"). Based on MORONI's Misrepresentations and Suppression CRONIN determined he would accept WALES as his new account representative.

24. In order to assure that CRONIN would terminate his "short" investments to the enrichment of Defendants, shortly after becoming CRONIN's account representative, WALES represented to CRONIN that if CRONIN followed his advice that he would never have an equity call and based on MORONI's representations of WALES' skills CRONIN believed WALES. Shortly after becoming CRONIN's account representative WALES represented to CRONIN that the silver market was going to turn upward and that CRONIN should drop his "short" approach and go with conventional purchases of silver (sometimes referenced at MONEX as "going long"). When CRONIN questioned WALES about this WALES reemphasized that he knew the price of silver was going to go up and that he would guaranty CRONIN he would not lose any money if CRONIN terminated his "short" investments and that he would give him a letter signed by someone else in the company guarantying him he would not lose money. ("WALES Misrepresentations"). WALES pressured CRONIN strongly and CRONIN accepted WALES' representations and assurances and acted upon them, based on the misrepresentations described above and his ignorance

of the suppressed facts described above.

25. By accepting WALES' Misrepresentations, in a few short weeks CRONIN lost in excess of $1.3 million of the funds he had invested and Plaintiff is informed and believes that Defendants enriched themselves by the same amount. In addition, had he received sound representations CRONIN would have realized a profit of $4 - 5 million on his "short" transactions. Instead, Plaintiff is informed and believes that Defendants had taken acts that would permit them to procure that profit instead of CRONIN.

26. Plaintiff is informed and believes that Defendant GALA was the sales director over WALES and that the sales team under WALES was doing poorly at the time that CRONIN was told by WALES to terminate his short investments and go long and that one motivation for the representations of WALES was so that WALES and GALA could make more money for MONEX and for themselves. Plaintiff is informed and believes that GALA was fully aware of the representations made by WALES and either instructed WALES to make them or fully approved of them by reason of the motivation just described.

27. Plaintiff is informed and believes, and thereon alleges, that Defendants followed the same or a similar pattern with all of Sherry Boland's former clientele (representing about a $21 million book of business) and that those clientele lost most of their investments after Boland's termination.