

JOHNSON AND ASSOCIATES
Einar Wm. Johnson  State Bar No. 111105
Sante Fe Business Park
2370 West Carson Street, Suite 141
Torrance, California 90501
(310) 783-0035

Attorneys For Plaintiff
DARTY CRONIN

### UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARTY CRONIN,<br><br>          Plaintiff,<br><br>     v.<br><br>MONEX   DEPOSIT   COMPANY,   a California limited Partnership, LOUIS   CARABINI,   MICHAEL CARABINI, MIKE MARONEY, DAVID GALA, DAN J. C. WALES, AND DOES 1 - 200<br><br>          Defendants. | Case No. SACV 08-01297DOC(MLGx)<br><br>FIRST AMENDED COMPLAINT<br><br>JURY DEMANDED<br><br>1. Fraud Under Commodity Futures<br>   Modernization Act of 2000<br><br>2. Common Law Fraud<br><br>3. Breach of Contract<br><br>4. Negligent Misrepresentation<br><br>5. Constructive Fraud<br><br>6. Common Count |

Plaintiff alleges as follows:

### JURISDICTION

1. The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1337 and 7 U.S.C. § 1, et seq.

**VENUE**

2. Plaintiff is informed and believes, and thereon alleges, that all Defendants reside in this District. In addition, the claim arose in this District.

**PARTY ALLEGATIONS**

3. Plaintiff DARTY CRONIN is an individual residing in the County of Los Angeles, State of California ("CRONIN").

4. Plaintiff is informed and believes, and thereon alleges, that Defendant MONEX DEPOSIT COMPANY ("MONEX") is a California limited partnership with its principle place of business in Orange County, California.

5. Plaintiff is informed and believes, and thereon alleges, that Defendant LOUIS CARABINI ("L. CARABINI") is an individual residing in Orange County, California.

6. Plaintiff is informed and believes, and thereon alleges, that Defendant MICHAEL CARABINI ("M. CARABINI") is an individual residing in Orange County, California.

7. Plaintiff is informed and believes, and thereon alleges, that Defendant MIKE MARONEY ("MARONEY") is an individual residing in Orange County, California.

- 2 -

8. Plaintiff is informed and believes, and thereon alleges, that Defendant DAVID GALA ("GALA") is an individual residing in Orange County, California.

9. Plaintiff is informed and believes, and thereon alleges, that Defendant DAN J. C. WALES ("WALES") is an individual residing in Orange County, California.

10. Plaintiff is not currently aware of the names and/or capacities of the Defendants sued herein as DOES 1 through 200, inclusive, and therefore sue said Defendants by such fictitious names. Plaintiff is informed and believes that said Defendants are responsible in some manner, or culpable for some reason, for Plaintiff's damages and the acts alleged herein. Plaintiff will amend this Complaint to allege the true names and capacities of these Defendants when the same are ascertained. Defendants MONEX, L. CARABINI, M. CARABINI, MARONEY, GALA, WALES, and DOES 1 through 200, inclusive, shall be collectively referred to herein as "Defendants".

11. Plaintiff is informed and believes that at all times mentioned herein, each of the Defendants sued herein was an agent, principal, representative, employer, or employee of each of the other Defendants acting within the purpose and scope of such agency, representation or employment, and that each Defendant directed, was aware of, acted upon, ratified, and/or accepted the benefits of the acts and representations of each of the other Defendants. In addition, Plaintiff is informed and believes that

Defendants entered a conspiracy with one another to commit the acts alleged herein below as more fully described herein below.

## INTRODUCTORY ALLEGATIONS

12. Plaintiff is informed and believes, and thereon alleges, that in or before June of 2007, Defendants MONEX, L. CARABINI, M. CARABINI, MARONEY, GALA, and WALES and Does 1 through 200, entered into a conspiracy to engage in the silvers futures market, without becoming members of a commission-designated board of trade as required by Federal law, and with the intent to divest investors of their monies for Defendants' personal gain by managing investment accounts for futures contracts in a manner calculated to cause their investors to lose money rather than to help investors realize gains. Plaintiff is further informed and believes, and thereon alleges, that in addition to seeking to have the benefits associated with clientele that were paying fees on transactions, and in addition to seeking to divorce their clientele from their money, that Defendants also devised a scheme pursuant to which they could leverage the monies invested by their clientele to generate profits of their own, including the profits their clientele would otherwise have realized. Plaintiff is further informed and believes, and thereon alleges, that at all relevant times Defendants were in need of substantial cash influx into MONEX by reason of the fact that at all relevant times the Internal Revenue Service was pursuing MONEX for over $378,000,000 in unpaid taxes. Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of them, undertook the acts described herein

in furtherance of said conspiracy.

13. MONEX advertises itself to be a purchaser and seller of precious metals. Plaintiff is informed and believes that this aspect of MONEX' business is simply a front to hide the unlawful and fraudulent activities that are described in this Complaint and to locate members of the general public that can be persuaded to invest in silver futures contracts.

14. In or about June of 2007, CRONIN contracted to purchase precious metals (gold and silver) from MONEX. CRONIN was introduced to MONEX by one of its account representatives, Sherri Boland ("Boland"). Plaintiff is informed and believes that he signed a written contract with MONEX relating to standard purchases of precious metals from MONEX and standard sales of precious metals to MONEX, though Plaintiff does not recall doing so. As explained below, said contract, if it exists, is not at issue in this litigation. In the course of purchasing precious metals from MONEX, Boland became CRONIN's MONEX account representative. MONEX describes its account representatives as being trained and experienced professionals in the precious metals market whose function is to provide investment strategies to their clientele. MONEX describes itself as being one of the most experienced and expert firms in the precious metals market.

15. In or about June, 2007, in the course of CRONIN's making of some standard purchases of precious metals from MONEX, Defendants learned that CRONIN had significant wealth and was of

the class of clientele that Defendants desired to target as a
victim of the fraudulent scheme described herein.

16. Accordingly, Defendants initially permitted Boland to
service CRONIN's account for the very reason that she was an honest
individual with no knowledge of Defendants' fraudulent intentions
who was extremely skilled in the precious metals market and whom
Defendants knew would instill trust and confidence in CRONIN and
guide him in the investment of substantial sums in futures
contracts without arousing suspicion as to Defendants' true intent
simply to take such funds from him.

17. Plaintiff is informed and believes, and thereon alleges,
that Defendants intentionally suppressed the following material
facts from Sherri Boland so that she would unwittingly act as
Defendants' agent in suppressing material facts from CRONIN and
other MONEX clientele: A) That MONEX was engaged in a futures
contract business that required that it be registered on a
commission-designated board of trade under federal law, B) that the
"short" investment program described below was of a nature that
required registration on a commission based board of trade under
federal law, C) that it was Defendants' actual intent not to assist
their clients to realize profits but was, instead, their intent to
steal their clients' money through fraud, deception, and unlawful
acts, D) that Defendants intended to maneuver "short" transactions
in a manner calculated to cause their clientele to lose money, and
E) that Defendants would utilize their clients' monies procured
through the "short" investment program in a manner so as to realize

profits of their own at the expense of their clients, including profits their clients would otherwise have realized. These suppressed facts shall hereinafter be referred to as the "Suppressed Facts".

18. Within a short time after CRONIN had made some standard purchases of precious metals from MONEX, he was advised by Sherri Boland, about a completely different MONEX program that had nothing to do with the conventional purchase and sale program that CRONIN started out with. Defendants represented to CRONIN, through their unwitting agent, Sherri Boland, that this different program would permit him to make a profit by selling silver when the price of silver was declining in the market with the aid of his account representative. This program was referred to as "going short". It was represented to CRONIN by Defendants, through Boland, that in a "short" transaction he would commit to MONEX to sell "borrowed" silver at a specified price and in a specified quantity and that under this program MONEX would assure CRONIN that it would arrange and assure the purchase of the silver at that price through an undisclosed purchaser and that at any given time in the future that CRONIN determined to buy the silver to cover the sale MONEX would produce a seller at the then existing market price. Accordingly, on a date certain CRONIN could lock in a sales price for silver at the then prevailing rate in a specified amount, but without having to cover the sale at that time, and could buy the silver to cover the sale at a future time of his own choosing at the market rates prevailing at the time of the election. Thus, if the price of silver went down after the commitment to sell CRONIN would make a

profit based on the "bet" that the price of silver would drop. If the price of silver increased above the committed sale price CRONIN could lose money if the market trend did not reverse and decline once again. CRONIN is informed and believes that Sherri Boland was authorized by her superiors at MONEX to offer this program to CRONIN, and to make the foregoing representations regarding it, and that she was given authority to enter into an oral agreement with CRONIN with regard to the program and as to each short transaction (CRONIN is informed and believes that as to each "short" transaction Boland would have to procure specific authorization from her superiors to enter such transaction).

19. The means through which MONEX could permit this program to operate are unknown to CRONIN as they were never explained to him. Only the concept that CRONIN could make a profit in a declining silver market on the terms just described was explained and represented and that this would ultimately be accomplished by MONEX guarantying to produce a buyer at the locked in sales price and a seller of the silver necessary to back CRONIN's prior "sale" from which CRONIN could purchase the silver to cover the sale at less than the sales price if the market declined. Plaintiff is informed and believes that to make this program work MONEX would have to have offsetting "long" transactions to balance the "short" transactions and that the "long" offsets were either from commitments of other MONEX customers or were the commitment of MONEX itself without the silver bullion to back it up. Indeed, Plaintiff is informed and believes that with regard to all short transactions he entered with MONEX pursuant to the oral agreement

- 8 -

1  further described below, that there was no physical transfer of
2  silver from seller to buyer (and that there was no intent that
3  actual physical delivery of silver would occur) and that a "short"
4  transaction was either literally a paper transaction with no silver
5  to back it or was for all practical purposes strictly a paper
6  transaction the value of which turned on the outcome of "betting"
7  on market trends over time rather than in the value of the
8  commodity in a straight forward purchase and sale.

10     20. In summary, at least the following misrepresentations were
11  made to CRONIN by Defendants through their unwitting agent Boland:
12  1) that MONEX was offering CRONIN an opportunity to make a profit
13  in a declining silver market when they harbored the opposite
14  intent, 2) that MONEX would provide a sound investment strategy,
15  designed to make his investments profitable, through the client's
16  account representative(this statement was true with regard to
17  Boland but was not true with regard to the intended future account
18  representative to be assigned to CRONIN under the bait and switch
19  described below), 3) that MONEX would act consistent with the
20  terms of the program as outlined above, and 4) that in all respects
21  Defendants had CRONIN's interests at heart. These
22  misrepresentations shall hereinafter be referred to as the "Initial
23  Misrepresentations".

25     21. Based on the Initial Misrepresentations and without
26  knowledge of the Suppressed Facts, CRONIN decided he wanted to
27  invest in "short" transactions with MONEX and to enter an agreement
28  with MONEX to that effect and so advised Sherri Boland. Boland

orally agreed to entry of such an agreement on behalf of MONEX,
with approval of her superiors, resulting in the formation of an
oral agreement between MONEX and CRONIN whereunder CRONIN could
invest in "short" transactions. Under existing law, and given the
foregoing facts, "short" transactions are "futures contracts" and,
accordingly, the referenced agreement as to "short" transactions
shall be referenced herein as the "Futures Contract". The terms of
the Futures Contract, express and implied, were as follows: 1)
CRONIN's account would be managed by an account representative who
would formulate and provide to CRONIN an investment strategy - -
i.e., whether to take conventional positions in silver or
whether to invest his monies in the "short" transaction format
wherein he could speculate as to whether the price of silver would
drop and profit if it did drop, 2) his account representative would
have CRONIN's best interests at heart, 3) that MONEX, through its
sole efforts outside of the control of CRONIN, would guaranty that
at any point in time that CRONIN decided to make the "purchase" to
offset the "sale" in a "short" transaction there would be a seller
available for CRONIN to buy at the then prevailing market rates
which would then be matched against his sell commitment - - thus
MONEX assured CRONIN that through its efforts CRONIN would be able
to sell high and buy low if the silver market dropped through this
deferred form of transaction, and 4) that CRONIN would go "short"
with the intent of making a profit based on pure speculation as to
fluctuations in the price of silver subject only to the risk that
silver market rates might rise instead of fall. Implied within this
oral agreement was a covenant of good faith and fair dealing
wherein MONEX agreed that it would do nothing to deprive CRONIN of

the benefit of his bargain, including by avoiding the making of statements that were calculated to cause CRONIN to lose money so that Defendants could enrich themselves. Such terms were applicable as to all of the specific investments CRONIN would make under the program. ("Futures Transactions").

22. Consistent with Defendants' plan to deceive CRONIN, Boland had CRONIN's interests at heart in managing his account and he gained trust and confidence in dealing with MONEX as a consequence of Defendants' permitting Boland to service his account. CRONIN entered Futures Transactions pursuant to the Futures Contract and made a profit by following Boland's investment strategy in this regard. Over time CRONIN invested millions in Futures Transactions. Plaintiff is informed and believes, and thereon alleges, that Defendants also permitted Boland to develop other substantial accounts with clientele that had substantial monies, also with the intent of building their faith and confidence and investment outlay, and then terminated Boland on or about July 18, 2008. By terminating BOLAND Defendants would be free to acquire control over CRONIN's "short" investments and to persuade him to change those positions in favor of conventional positions of silver all as further set forth herein.

23. Plaintiff is informed and believes that at all relevant times L. CARABINI and M. CARABINI supervised and controlled the actions of MARONEY who was the Vice President of MONEX, that as Vice President MARONEY was involved in management at MONEX and had been one of the individuals that ultimately supervised Sherri

Boland and other MONEX account representatives. On or about July 18, 2008, MARONEY represented to CRONIN, in substance, that Sherri Boland would no longer be handling CRONIN's account but that CRONIN should not be concerned because WALES was being assigned to his account and that WALES was the best account representative that MONEX had and that he had more expertise, knowledge and sophistication in silver investments than CRONIN and that CRONIN could, and should, trust WALES' statements to CRONIN. MARONEY further represented to CRONIN that WALES knew CRONIN's account and wanted to take care of it and that WALES got all of the big accounts like CRONIN's. CRONIN did not know WALES and accepted, as true, MARONEY's representation. MARONEY also suppressed the fact that Boland had been terminated by MONEX - - a fact which would have proved highly relevant to CRONIN given his trust and confidence in Boland. ("MARONEY Misrepresentations and Suppression"). Based on MARONEY's Misrepresentations and Suppression CRONIN determined he would accept WALES as his new account representative.

24. In order to assure that CRONIN would change his "short" positions to the enrichment of Defendants, shortly after becoming CRONIN's account representative, WALES represented to CRONIN that if CRONIN followed his advice that he would never have an equity call and based on MARONEY's representations of WALES' skills CRONIN believed WALES. Shortly after becoming CRONIN's account representative WALES represented to CRONIN that the silver market was going to turn upward and that CRONIN should change his "short" position and go with a conventional position of silver (sometimes

referenced at MONEX as "going long"). When CRONIN questioned WALES about this WALES reemphasized many times that he knew the price of silver was going to go up and that he would guaranty CRONIN he would not lose any money if CRONIN changed his "short" positions and that he would give him a letter signed by someone else in a superior position in the company guarantying him he would not lose money and that by the end of the year the account would be worth 3 or 4 million dollars. ("WALES Misrepresentations"). WALES pressured CRONIN strongly and CRONIN accepted WALES' representations and assurances and acted upon them, based on the misrepresentations described above and his ignorance of the suppressed facts described above.

25. By accepting WALES' Misrepresentations, in a few short weeks CRONIN  lost in excess of $1.3 million of the funds he had invested and Plaintiff is informed and believes that Defendants enriched themselves by the same amount. In addition, had he received sound representations CRONIN would have realized a profit of $4 - 5 million on his "short" transactions. Instead, Plaintiff is informed and believes that Defendants had taken acts that would permit them to procure that profit instead of CRONIN.

26. Plaintiff is informed and believes  that  Defendant  GALA was the sales director over WALES and that the sales team under WALES was doing poorly at the time that CRONIN was told by WALES to change his short positions and go long and that one motivation for the representations of WALES was so that WALES and GALA could make more money for MONEX and  for  themselves. Plaintiff  is  informed

and believes that GALA was fully aware of the representations made by WALES and either instructed WALES to make them or fully approved of them by reason of the motivation just described.

27. Plaintiff is informed and believes, and thereon alleges, that Defendants followed the same or a similar pattern with all of Sherri Boland's former clientele (representing about a $21 million book of business) and that those clientele lost most of their investments after Boland's termination.

**FIRST CAUSE OF ACTION**

**FOR FRAUD UNDER COMMODITY**

**FUTURES MODERNIZATION ACT OF 2000**

**7 U.S.C. § 6b**

**(AGAINST ALL DEFENDANTS)**

28. Plaintiff incorporates herein by reference Paragraphs 1 through 27 of this Complaint as if fully set forth herein.

29. The Suppressed Facts and the MARONEY suppressed fact, were material facts of import to CRONIN in his decisions and of which he was ignorant. These facts were suppressed by Defendants, despite their obligation to disclose them, with the intent to defraud CRONIN and with the intent to induce him to act in ignorance thereof. The Initial Misrepresentations, the MARONEY Misrepresentations, and the WALES Misrepresentations were made with the intent to defraud CRONIN and with the intent to induce him to act thereon and were false and Defendants knew they were false. The

- 14 -

true facts were, among others, those reflected in the facts that
were suppressed and the fact that WALES was one of the worst
account representatives at MONEX who did not have CRONIN's interest
at heart, but was instead assigned to the account for the specific
purpose of causing CRONIN to lose his investments and to preclude
him from realizing his profits. Plaintiff is further informed and
believes that WALES did not believe that the price of silver would
increase at the time he so represented and warranted to CRONIN. In
addition, the Futures Contract and all Futures Transactions
emanating therefrom, are contracts for purchase and sale of a
commodity for future delivery within the meaning of 7 U.S.C. § 6(a)
requiring Defendants to comply with the registration requirements
of 7 U.S.C. § 6(a). Defendants entered the Futures Contract and
made the Futures Transactions thereunder in violation of 7 U.S.C.
§ 6(a), all pursuant to their conspiracy. Accordingly, the Futures
Contract and all Futures Transactions thereunder are illegal off-
exchange contracts.

30. CRONIN acted in ignorance of the facts that were suppressed
and believed the representations and justifiably relied thereon.
Had CRONIN known the true facts CRONIN would not have entered into
the Futures Contract and would not have entered the Futures
Transactions and would, instead, have made investments in the
futures market with a legitimate company. Had CRONIN known the true
facts with regard to the MARONEY Misrepresentations and Suppression
and the WALES Misrepresentations he would not have changed his
"short" positions.

31. Plaintiff is informed and believes that Defendants, pursuant to their conspiracy, desired that the Futures Contract and the Futures Transactions appear to be legitimate to CRONIN so as to gain his trust and confidence with the intent that he would invest substantial sums in short contracts with the intent of realizing a large return and then utilized the MARONEY Misrepresentations and Suppression and the WALES Misrepresentations to cause CRONIN to change his "short" positions. Plaintiff is informed and believes that in addition to causing CRONIN to lose in excess of $1.3 million of the dollars that he had invested, which Plaintiff is informed and believes enriched Defendants, that Defendants were also able to enrich themselves with the $4 - $5 million dollars in profits that CRONIN would have realized had he not been persuaded to change his "short" positions.

32. The foregoing fraud exercised by Defendants in connection with the Futures Contract and the Futures Transactions were violations of 7 U.S.C. § 6b. In addition to their culpability pursuant to the conspiracy, Defendants are also all responsible for said violations under 7 U.S.C. § 13c by reason of the fact that each of the Defendants wilfully aided and abetted each of the other Defendants in the commission of said violations.

33. As a proximate result of said violations Defendants have caused Plaintiff to be damaged in an amount in excess of $6.3 million and according to proof together with interest thereon at the legal rate of 10% per annum.

## SECOND CAUSE OF ACTION
## CALIFORNIA COMMON LAW FRAUD
### (AGAINST ALL DEFENDANTS)

34. Plaintiff incorporates herein by reference Paragraphs 1 through 31, inclusive, as if fully set forth herein.

35. As a proximate result of said fraud Defendants have caused Plaintiff to be damaged in an amount in excess of $6.3 million and according to proof together with interest thereon at the legal rate of 10% per annum.

36. In doing the acts alleged herein, and by reason of the facts and circumstances alleged herein, Defendants, and each of them, acted with oppression, fraud, and malice towards Plaintiff, entitling Plaintiff to an award of punitive damages in an amount in excess of $24 million and according to proof.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT
### (AGAINST ALL DEFENDANTS)

37. Plaintiff incorporates herein by reference Paragraphs 1 - 31, inclusive, of this Complaint as if fully set forth herein.

38. As alleged above, Plaintiff and Defendant MONEX entered into the Futures Contract and pursuant to that contract entered into various Futures Transactions which were controlled by the same

terms set forth in the Futures Contract.

39. Plaintiff has performed all obligations required of it under said contract and said transactions.

40. MONEX breached the agreement with Plaintiff pursuant to the conspiracy alleged above by, among other things, suppressing the Suppressed Facts and the MARONEY suppressed fact, making the Initial Misrepresentations, the MARONEY Misrepresentations, and the WALES Misrepresentations, providing through WALES a purported account strategy that was intended to fail, providing an account representative that did not have the experience, knowledge and sophistication promised, failing to disclose to CRONIN that MONEX did not want CRONIN to retain or profit from his short positions and acting consistent with that suppressed intent, and by taking acts, and making statements and representations, that were calculated to deprive CRONIN of the benefit of his bargain.

41. As a proximate result of said breaches Plaintiff has been damaged in an amount in excess of $6.3 million and according to proof together with interest thereon at the legal rate of 10% per annum and according to proof.

### FOURTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

### (AGAINST ALL DEFENDANTS)

42. Plaintiff incorporates herein by reference paragraphs 1

through 27 of this Complaint as if fully set forth herein.

43. Plaintiff alleges, in the alterative, that the MARONEY Misrepresentations, and the WALES Misrepresentations were made with the intent to induce CRONIN to act thereon and were false and Defendants made such representations with no reasonable ground for believing them to be true. The true facts were those reflected in the facts that were suppressed and the fact that WALES was one of the worst account representatives at MONEX who did not have CRONIN's interest at heart, but was instead assigned to the account for the specific purpose of causing CRONIN to lose his investments and to preclude him from realizing his profits. Plaintiff is further informed and believes that WALES had no reasonable ground to believe that the price of silver would increase at the time he so represented and warranted to CRONIN.

44. CRONIN believed the representations and justifiably relied thereon. Had CRONIN known the true facts CRONIN would not have changed his "short" positions.

45. As a consequence of said misrepresentations and his reliance thereon Plaintiff lost in excess of $1.3 million of the dollars that he had invested and is further informed and believes that he lost $4 - $5 million dollars in profits that he would have realized had he not been defrauded.

46. Accordingly, Defendants have caused Plaintiff to be damaged in an amount in excess of $6.3 million and according to

1 proof together with interest thereon at the legal rate of 10% per
2 annum.

3

4     47. In doing the acts alleged herein Defendants, and each of
5 them, acted with a wilful or conscious disregard of the rights of
6 Plaintiff, entitling Plaintiff to punitive damages in an amount in
7 excess of $24,000,000 and according to proof.

8

9                    **FIFTH CAUSE OF ACTION**
10                    **CONSTRUCTIVE FRAUD**
11                    **(AGAINST ALL DEFENDANTS)**

12

13     48. Plaintiff incorporates by reference paragraphs 1 - 31,
14 inclusive, of this Complaint as if fully set forth herein.

15

16     49. By reason of the facts alleged hereinabove, including the
17 entry of the Futures Contract and the representations of Defendants
18 to Plaintiff, either a fiduciary relationship or a confidential
19 relationship in which Plaintiff placed trust and confidence in the
20 integrity and fidelity of Defendants was formed between Plaintiff
21 and Defendants.

22

23     50. By reason of said relationship Defendants, and each of
24 them, had a duty not to gain any advantage over Plaintiff by
25 misleading him to his prejudice. Thus, Defendants had an obligation
26 of full and honest disclosure of all material facts known to
27 Defendants with regard to the Futures Contract and the Futures
28 Transactions.

51. Defendants breached that duty to Plaintiff's prejudice through the acts, statements, and suppressions of fact alleged herein above.

52. As a proximate result of said constructive fraud, Defendants have caused Plaintiff to be damaged in an amount in excess of $6.3 million and according to proof together with interest thereon at the legal rate of 10% per annum.

53. In doing the acts alleged herein, and by reason of the facts and circumstances alleged herein, Defendants, and each of them, acted with oppression, fraud, and malice towards Plaintiff and/or acted with wilful disregard for the rights of Plaintiff, entitling Plaintiff to an award of punitive damages in an amount in excess of $24 million and according to proof.

## SIXTH CAUSE OF ACTION

### COMMON COUNT FOR

### MONEY HAD AND RECEIVED

### (AGAINST ALL DEFENDANTS)

54. Plaintiff incorporates herein paragraphs 1 through 31 and 53 of this Complaint as if fully set forth herein.

55. Within the last two years, in Orange County, California, Defendants, and each of them, became indebted to Plaintiff in a sum, the exact amount of which is currently unknown, but which is believed to be in excess of $6.3 million, and according to proof,

for money had and received by Defendants for the use and benefit of Plaintiff.

56. Neither the whole, nor any part, due to Plaintiff by Defendants, as alleged herein, has been paid, and there is now due, owing, and unpaid from Defendants, and each of them, to Plaintiff a sum in excess of $6.3 million and according to proof together with interest thereon at the legal rate of 10% per annum and according to proof.

WHEREFORE, Plaintiff prays judgment against all Defendants, and each of them, as follows:

## ON THE FIRST AND THIRD
## CAUSES OF ACTION

1. For damages in an amount in excess of $6.3 million and according to proof, together with interest thereon at the legal rate of 10% per annum and according to proof.

## ON THE SECOND, FOURTH,
## FIFTH AND SIXTH
## CAUSES OF ACTION

1. For damages in an amount in excess of $6.3 million and according to proof, together with interest thereon according to proof.

2.   For   punitive   damages   in   excess   of   $24,000,000   and according to proof.

## ON ALL CAUSES OF ACTION

1.   For costs of suit, including reasonable attorney fees to any extent allowed by law.

2.   For such other and further relief as the court deems just and proper.

Dated: December 4, 2008

JOHNSON AND ASSOCIATES

By: _____
Einar Wm. Johnson
Attorneys For Plaintiff
DARTY CRONIN