1  JOHNSON AND ASSOCIATES
   Einar Wm. Johnson   State Bar No. 111105
2  Sante Fe Business Park
   2370 West Carson Street, Suite 141
3  Torrance, California 90501
   (310) 783-0035
4
   Attorneys For Plaintiff
5  DARTY CRONIN

6

7                **UNITED STATES DISTRICT COURT**

8          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

10

11 DARTY CRONIN,                        Case    No.    SACV    08-
                                        01297DOC(MLGx)
12           Plaintiff,
                                        OPPOSITION   TO   MOTION   TO
13                                      COMPEL ARBITRATION AND FOR AN
            v.                          ORDER  STAYING  THIS  ACTION;
14                                      DECLARATION OF DARTY CRONIN,
                                        DECLARATION OF SHERRY BOLAND,
15                                      DECLARATION   OF   EINAR   Wm.
   MONEX    DEPOSIT    COMPANY,   a     JOHNSON
16 California  limited  Partnership,
   LOUIS CARABINI, MICHAEL CARABINI,    Date: February 2, 2009
17 MIKE MARONEY, DAVID GALA, DAN J.     Time: 8:30 a.m.
   C. WALES, AND DOES 1 - 200           Dept.: 9-D
18
                                        Discovery Cut Off: None
19           Defendants.                Motion Cut Off: None
                                        Trial Date: None
20

21

22

23      Plaintiff DARTY CRONIN submits the following opposition to

24 Defendants' Motion to Compel Arbitration and to stay the action:

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . 1

III. MONEX HAS FAILED TO MEET ITS BURDEN
        OF PROOF IN SUPPORT OF ITS MOTION . . . . . . 6

IV. EVEN ASSUMING FOR ARGUMENT'S SAKE
THAT THE PURPORTED CONTRACT BETWEEN MONEX
DEPOSIT COMPANY AND CRONIN WERE KNOWINGLY
SIGNED BY ALL PARTIES, WHICH HAS NOT BEEN
ESTABLISHED, THE DISPUTE BETWEEN THE
PARTIES IS NOT WITHIN THE SCOPE OF SUCH
PURPORTED AGREEMENT . . . . . . . . . . . . . . 8

V. EVEN ASSUMING SOLELY FOR ARGUMENT'S
SAKE THAT A CONTRACT WITH AN ARBITRATION
PROVISION HAD BEEN SHOWN AND THAT THE
DISPUTES BETWEEN THE PARTIES WERE WITHIN
THE SCOPE OF THAT AGREEMENT READING THE
CONTRACT AS A WHOLE - - WHICH IS NOT THE
CASE - - THE PURPORTED ARBITRATION CLAUSE
SHOULD BE DECLARED UNENFORCEABLE AS
UNCONSCIONABLE . . . . . . . . . . . . . . . . 15

-i-

VI. THERE IS NO BASIS TO STAY THE ACTION. . . . . 25

1

**TABLE OF AUTHORITIES**

2

3 **A. FEDERAL AUTHORITIES.**

4

5 **1. Case Authorities.**

6

7 Circuit City Stores, Inc. v. Mantor,

8 335 F.3d 1101, 1106 (9th Cir. 2003) . . . . . . . . . 17

9

10 Commodities Futures Trading

11 Commission v. Noble Metals

12 International, Inc.,

13 67 F.3d 766 (9th Cir. 1995) . . . . . . . . . . . . 10 - 12

14

15 Hornbeck Offshore (1984) Corp.

16 v. Coastal Carriers Corp.,

17 981 F.2d 752(5th Cir. 1993) . . . . . . . . . . . 25

18

19 Maganallez v. Hilltop Lending Corp.,

20 505 F. Supp.2d 594 (N.D. Cal. 2007) . . . . . . . . 7

21

22 **2. Statutory Authorities.**

23

24 7 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . 10

25

26

27

28

**B. STATE AUTHORITIES.**

**1. Case Authorities.**

Alperson v. Mirisch Company, 250 Cal. App.2d 84,
58 Cal. Rptr. 178, 182 (1967) . . . . . . . . . . . 14 - 15

Arista Films, Inc. Employee Profit
Sharing Plan v. Gilford Securities, Inc.,
43 Cal. App.4th 495, 501, 51 Cal.
Rptr.2d 35 (1996). . . . . . . . . . . . . . . . . 7

Baker v. Osborne Development Corporation,
71 Cal. Rptr.3d 854, 861 (2008). . . . . . . . . . 16, 19, 21,
                                                   22, 23 - 24

Bruni v. Didion, 73 Cal. Rptr.3d 395(2008) . . . . . .6, 9, 16 -
                                                   17, 18, 19 -
                                                   21, 24

Cione v. Foresters Equity Services,
58 Cal. App.4th 625, 68 Cal. Rptr.2d 167 (1997). . . . 9

Daisy Mfg. Co., Inc. v. NCR Corp.,
29 F3d 389 (8th Cir. 1994) . . . . . . . . . . . . . . . 9

Harper v. Ultimo, 113 Cal. App.4th 1402,

7 Cal. Rptr.3d 418 (2003) . . . . . . . . . . . . . . 17, 22

Hope v. Superior Court, 122 Cal. App.3d 147,

175 Cal. Rptr. 851(1981) . . . . . . . . . . . . . . 17 - 18

Marsch III v. Williams, 23 Cal. App.4th,

28 Cal. Rptr.2d 398 (1994) . . . . . . . . . . . . 6

Metaclad Corp. v. Ventana Envtl.

Organizational P'tship, 109 Cal. App.4th 1705,

1 Cal. Rptr.3d 328, 33 (2003) . . . . . . . . . . 14

Pardee Construction Co. v. Superior Court,

100 Cal. App.4th 1081,

123 Cal. Rptr.2d 288(2002). . . . . . . . . . . . . 17, 24 - 25

Parker v. Twentieth Century-Fox Film Corp.,

118 Cal. App.3d 901, 173 Cal. Rptr. 639 (1981) . . . 14

Smith v. Superior Court, 202 Cal. App.2d 128,

20 Cal. Rptr. 512 (1962) . . . . . . . . . . . . 13 - 14

**2. Statutory Authorities.**

California Civil Code § 1550 . . . . . . . . . . . 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

California Civil Code § 1641 . . . . . . . . . . . . . 14

## I. INTRODUCTION.

Defendants have failed to meet their burden to show the existence of an agreement running between the parties requiring arbitration. The purported contract between CRONIN and MONEX DEPOSIT COMPANY ("MONEX") has not been properly authenticated. CRONIN has no recollection of ever having been presented with such a document, ever having read such a document, or ever having signed such a document. Furthermore, CRONIN has alleged that the agreement giving rise to his claims for relief was an oral agreement and he has stated that the subject of arbitration was never discussed with him.

Furthermore, the purported contract presented by Defendants asserts that transactions subject to the agreement are not subject to the regulation of the Commodity Futures Trading Commission, but as will be illustrated herein the oral agreement sued upon, and the "short" transactions undertaken pursuant thereto, are subject to the regulation of that Commission, hence the purported contract cannot be reasonably construed to cover the claims raised by CRONIN in his First Amended Complaint. The integration clause of that agreement also precludes an assertion that the oral agreement sued upon would be within the reach of MONEX's purported contract.

Even assuming the foregoing were not sufficient to defeat the motion, the asserted arbitration clause is unconscionable and should not be enforced by this Court in any event.

## II. STATEMENT OF FACTS.

In or about June of 2007, CRONIN saw an ad that was being run by MONEX DEPOSIT COMPANY offering gold coins for sale. CRONIN had a gentleman by the name of Howard Lewis contact MONEX and Mr. Lewis

- 1 -

provided CRONIN with the name of Sherri Boland, a MONEX representative. CRONIN ordered substantial quantities of gold coins (ultimately approximately $2,000,000 worth) from MONEX through Sherri Boland for physical delivery. Mr. Lewis and CRONIN went to MONEX in or about June of 2007 to pick up the purchased coins. CRONIN met Sherri Boland in person at that time. See Declaration of Darty Cronin attached hereto ("Cronin Decl.") and Declaration of Sherri Boland ("Boland Decl.").

Ms. Boland told CRONIN about an investment opportunity that was different than just purchasing and holding precious metals (what CRONIN understands MONEX to describe as its "long" program where conventional purchases of precious metals could be made where large quantities of precious metals could be purchased without taking physical delivery of the product as the product was supposed to be stored on behalf of the purchaser at third party institutions). Specifically CRONIN was told by Ms. Boland about what she called a "short" program or "going short" whereunder CRONIN could make money by betting on whether silver would decline in value. CRONIN had never participated in such a program before, but was told by Ms. Boland that she had an 80% success rate with her investment strategies and that she would be happy to assist CRONIN if he so desired. CRONIN asked for references to verify Ms. Boland's representation and departed with his purchased coins. Cronin Decl. and Boland Decl.

Thereafter CRONIN contacted the references who confirmed that Ms. Boland was competent and provided excellent investment advice; she was highly recommended. CRONIN Decl.

After checking the references, upon returning to MONEX to pick

- 2 -

up more coins, CRONIN talked further with Ms. Boland about
investment strategies. She further discussed the short program
whereunder he could commit to MONEX to sell "borrowed" silver at a
specified price and in a specified quantity and that under this
program MONEX would assure him that it would arrange and assure the
purchase of the silver at that price through an undisclosed
purchaser and that at any time in the future that CRONIN determined
to buy the silver to cover the sale MONEX would produce a seller at
the then existing market price. Accordingly, on a date certain
CRONIN could lock in a sales price for silver at the then prevailing
rate in a specified amount, but without having to cover the sale at
that time, and could buy the silver to cover the sale at a future
time of his own choosing at the market rate prevailing at the time
of the election so that if the price of silver went down after his
commitment to sale the "borrowed" silver he would make a profit
based on the "bet" that the price of silver would drop. The means
through which MONEX could permit this program to operate were
unknown to CRONIN as they were never explained to him. Only the
concept that he could make a profit in a declining market on the
terms just described was explained. CRONIN Decl. and Boland Decl.
Under this program there was no physical transfer of silver from
seller to buyer, as had been the case with his purchase of the gold
coins and a "short" transaction was either literally a paper
transaction with no silver to back it or was for all practical
purposes strictly a paper transaction, the value of which turned on
the outcome of "betting" on market trends over time. CRONIN Decl.

   CRONIN told Ms. Boland that he wanted to participate in the
"short" program and entered an oral contract with MONEX, through Ms.

Boland, to participate in the short program. The terms of that agreement were as follows: 1) CRONIN's account would be handled by an account representative who would formulate and provide to him an investment strategy - - i.e., whether to take conventional positions in silver or whether to invest his monies in the "short" program wherein he could speculate on whether the price of silver would drop, 2) his account representative would have his best interest at heart, 3) that MONEX, through its sole efforts, outside of CRONIN's control, would guaranty that at any point in time that he decided to make the "purchase" to offset the "sale" of the "borrowed" silver, there would be a seller available for him to buy at the then prevailing market rates which would then cover the "sale" of the "borrowed" silver - - in short, MONEX assured CRONIN, through Ms. Boland, that through its efforts he would be able to sell high and buy low through this deferred form of transaction if the silver market dropped, and 4) that CRONIN would go "short" with the intent of making a profit based on pure speculation as to fluctuations in the price of silver subject only to the risk that silver market rates might rise instead of fall. At no time was there discussion with CRONIN of having any dispute of any kind with MONEX submitted to arbitration and there was never any discussion of CRONIN giving up any of his rights to go to court and have a jury decide any claims he might have against MONEX. CRONIN Decl. and Boland Decl.

CRONIN has never met an individual by the name of Harvey Kochen. CRONIN Decl. and Boland Decl. CRONIN does not recall signing any documentation for MONEX or being presented any documentation for signature by MONEX other than acknowledgment of receipt of his coins. CRONIN does not recall ever seeing, reading, or signing the

documents that are appended to the Declaration of Harvey Kochen. CRONIN is also not familiar with the kind of documentation, if any, that would normally be utilized in engaging in the types of transactions he engaged in with MONEX and, as noted above, he had never been involved in a program like the short program described above. CRONIN Decl.

CRONIN is not familiar with an organization known as "JAMS" and is not familiar with the arbitration rules of JAMS. CRONIN Decl. The purported contract appended to the Kochen Declaration does not have appended thereto the JAMS arbitration rules.

Ms. Boland had the responsibility at MONEX for procuring her clients' signatures on the types of documents appended to the Declaration of Harvey Kochen. However. Ms. Boland has no specific recollection of having procured CRONIN's signature on documents of that nature. In addition, had Ms. Boland sought to procure such a signature from CRONIN she would have undertaken to do so using the techniques she had been taught in her MONEX training. Specifically, she was to try to get a signature on the documents in a short shrift manner at time of presentation. Furthermore, contracts of the nature appended to the Declaration of Harvey Kochen were presented to clients of MONEX on a take it or leave it basis with no opportunity for negotation of terms. See Boland Decl.

Only MONEX DEPOSIT COMPANY has been sued in this action, making Exhibit 2 to the Kochen Declaration irrelevant (even if it were relevant it would be subject to all of the same arguments that are advanced as to the purported MONEX DEPOSIT COMPANY contract. The document purporting to be a contract between CRONIN and MONEX DEPOSIT COMPANY is entitled "Purchase and Sale Agreement" and its

contents do not address "short" transactions. In addition, the contract document is lengthy and the language addressing arbitration is not set forth in capitalization or bold type.

**III. MONEX HAS FAILED TO MEET ITS BURDEN OF PROOF IN SUPPORT OF ITS MOTION.**

In Bruni v. Didion, 73 Cal. Rptr.3d 395, 401 (2008), the Court declared, amongst other important principles, that "[t]he petitioner [seeking to compel arbitration] bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence . . ."

The importance of a finding that a contract for arbitration exists is reflected in Marsch III v. Williams, 23 Cal. App.4th, 28 Cal. Rptr.2d 398 (1994), wherein the parties' relationship was defined by two contracts, one with an arbitration clause and one without, and the court found there could be no arbitration compelled under the agreement that had no arbitration clause:

> Although California has a strong policy favoring arbitration [citations omitted], our courts also recognize that the right to pursue claims in a judicial forum is a substantial right and not one lightly to be deemed waived. [Citations omitted]. Because the parties to an arbitration clause surrender this substantial right, the general policy favoring arbitration cannot replace an agreement to arbitrate. [Citations omitted]. Thus, the right to compel arbitration depends upon the contract between the parties [citations omitted], and a party can be compelled to submit to arbitration only where he has agreed to so in writing. . . . 23 Cal. App.4th 254 - 255, 28 Cal Rptr.2d at 400.

See also <u>Arista Films, Inc. Employee Profit Sharing Plan v. Gilford Securities, Inc.</u>, 43 Cal. App.4th 495, 501, 51 Cal. Rptr.2d 35, 39 (1996) (". . .[a]rbitration is recognized as a matter of contract, and a party cannot be forced to arbitrate something in the absence of an agreement to do so.'[Citation]"(Chan v. Drexel Burnham Lambert, Inc. (1986) 178 Cal. App.3d 632, 640, 223 Cal. Rptr. 838.)

> The policy favoring arbitration, however, does not come into play unless it is determined that the parties agreed to arbitrate their disputes, a determination that requires analysis of the state law principles that govern the formation and interpretation of contracts. See Bodie v. Bank of America, 67 Cal. App.4th, 779, 790, 79 Cal. Rptr.2d 273 (1998).

<u>Maganallez v. Hilltop Lending Corp.</u>, 505 F. Supp.2d 594, 601 (N.D. Cal. 2007). Mutual consent is an essential element of contract formation under California law. California Civil Code § 1550.

In this instance the purported contract between MONEX and CRONIN which is Exhibit 1 to the Harvey Kochen Declaration is the purported agreement to arbitrate. However, no proper authentication has been given to that purported contract. While Mr. Kochen states in Paragraph 3 of his Declaration that he is familiar with the process pursuant to which agreements are entered between MONEX DEPOSIT COMPANY and new customers, he does not state in his Declaration what that procedure is or whether it was followed as to the documents appended to his Declaration. (Again, MONEX Credit Company has not been sued by CRONIN so Plaintiff fails to see the relevance of Exhibit No. 2 to the Kochen Declaration, but even assuming it were relevant the same arguments made herein as to the

Exhibit 1 purported contract would apply equally to the Exhibit 2 purported contract).

In paragraph 4 of the Kochen Declaration, Mr. Kochen attests that he personally "processed" the "Purchase and Sale Agreement" purportedly entered with CRONIN. However, Mr. Kochen's purported signature does not appear on that document and Mr. Kochen says nothing regarding the purported signature for MONEX DEPOSIT COMPANY that does appear on that document. Mr. Kochen also has not attested that CRONIN signed the document in or out of Mr.Kochen's presence. Since CRONIN has testified that he does not know Harvey Kochen, Mr. Kochen obviously cannot do so. (See Cronin Decl. and Boland Decl.)

In Paragraph 5 of the Kochen Declaration, Mr. Kochen makes the same deficient statements as to the irrelevant purported contract between CRONIN and MONEX CREDIT COMPANY.

Since the purported contract has not been properly authenticated and since CRONIN has no recollection of ever having been presented with such a document or having seen, read, or signed such a document, and has attested to an oral agreement with no arbitration provisions with regard to transactions before this Court, MONEX has failed to meet its burden of proof to present a contract between the parties for arbitration.

**IV. EVEN ASSUMING FOR ARGUMENT'S SAKE THAT THE PURPORTED CONTRACT BETWEEN MONEX DEPOSIT COMPANY AND CRONIN WERE KNOWINGLY SIGNED BY ALL PARTIES, WHICH HAS NOT BEEN ESTABLISHED, THE DISPUTE BETWEEN THE PARTIES IS NOT WITHIN THE SCOPE OF SUCH PURPORTED AGREEMENT.**

In addition to having the burden to show that a contract for arbitration exists between the parties, Defendants have the obligation to establish that the dispute before the Court is within

1  the terms of that asserted contract.

2      The case of Daisy Mfg. Co., Inc. v. NCR Corp., 29 F3d 389, 392

3  (8th Cir. 1994), cited by Defendants, references this requirement:

4          As the district court stated, before a party may be compelled

5          to arbitrate under the Federal Arbitration Act, the court must

6          engage in a limited review to endure that the dispute "is

7          arbitrable - - i.e., that a valid agreement to arbitrate

8          exists between the parties and that the specific dispute falls

9          within the substantive scope of the agreement. PaineWebber,

10         Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990)."

11     The same principle is stated in Cione v. Foresters Equity

12 Services, 58 Cal. App.4th 625, 634, 68 Cal. Rptr.2d 167, 171 - 172

13 (1997), also cited by Defendants:

14         "The right to arbitration depends upon contract; a petition to

15         compel arbitration is simply a suit in equity seeking specific

16         performance of that contract. [Citations.] There is no public

17         policy favoring arbitration of disputes which the parties have

18         not agreed to arbitrate. [Citation.]" (Engineers & Architects

19         Assn. v. Community Development Dept. (1994) 30 Cal.App.4th

20         644, 653, 35 Cal. Rptr.2d 800.) As noted, the FAA does not

21         apply until the existence of an enforceable arbitration

22         agreement is established under state law principles involving

23         formation, revocation and enforcement of contracts generally.

24         [Citations] Hence, in seeking to compel arbitration, FESCO was

25         required to prove the existence of an enforceable agreement

26         containing a provision mandating arbitration of the employment

27         dispute between Cione and Fesco. [Citation].

28 See also, e.g., Bruni v. Didion, supra, 73 Cal. Rptr.3rd at 405.

- 9 -

CRONIN has expressly alleged in the First Amended Complaint that the oral agreement he entered with MONEX for "short" transactions and the resulting transactions were futures contracts subject to the regulation of the Commodity Futures Trading Commission. Indeed, the nature of the "short" transactions agreement, set forth above, and described in the First Amended Complaint, does not contemplate a conventional purchase and sale of silver, but is actually structured to permit a profit in a declining market, contrary to the standard notion that one cannot profit where the value of a commodity has decreased after its purchase and before its resale. The transactions underlying the agreement are clearly futures transactions. They also contemplate future delivery of the commodity. Defendants have not disputed this important allegation - - they merely assert that the statutory claim would be within the scope of the arbitration clause.

The law also supports Plaintiff's position:

. . . [7 U.S.C.] Section 4(a) provides:

It shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business . . . for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery . . . unless - -

(1) such transaction is conducted on or subject to the rules of a board of trade which has been designated by the Commission [Commodities Futures Trading Commission] as a "contract market" for such commodity. . . .

In <u>Commodities Futures Trading Commission v. Noble Metals</u>

International, Inc., 67 F.3d 766,773 (9th Cir. 1995), contracts were entered for the purchase of precious metals which were to be stored with third parties and not actually physically delivered to the purchaser with only paper being provided to the purchaser to reflect title. The Court concluded these contracts were future delivery contracts within the scope of the regulatory requirements:

> According to Noble and Mooregate, they satisfied this requirement by transferring, i.e., "delivering," title to the metals to the investor; the metals may have been held by the third-party depository, but the investor owned the metals, as reflected by his documents of title, and thus had taken delivery.

> We reject the argument. To take advantage of the cash forward contract exclusion under the Act, the delivery requirement cannot be satisfied by the simple device of a transfer of title. As we said in Co Petro, "a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity." Co Petro, 680 F.2d at 578. If this were not so, the cash forward contract exception would quickly swallow the futures contract rule.

> "[S]elf-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts subject to the CEA]." American Metal Exch. Corp., 693 F. Supp. 168, 192 (D.N.J. 1988)(quoting CFTC v. Morgan, Harris, & Scott Ltd., 484 F. Supp. 669, 675 (S.D.N.Y. 1979)). Here, there was no legitimate expectation that Noble's and Mooregate's customers would take actual delivery of the metal they bought.

1    The Forward Delivery Program contracts, therefore, were

2    futures contracts subject to the Commission's jurisdiction,

3    and when Noble and Mooregate sold them in off-exchange

4    transactions they violated section 4(a) of the Act.

5  67 F.3rd at 772 - 773. As reflected in the First Amended Complaint

6  and in the Declaration of CRONIN, there was no physical delivery of

7  silver contemplated with the "short" transaction agreement and the

8  transactions entered pursuant thereto - - the transactions

9  facilitated betting on the price of silver on a paper record.

10    The purported contract between MONEX and CRONIN, asserted by

11  MONEX provides ". . . that transactions subject to this agreement

12  are cash trades with MDC and that such trades are not subject to

13  regulation by the Commodities Futures Trading Commission or the

14  National Futures Association." See page 1 of Exhibit 1 to Harvey

15  Kochen Declaration, paragraph numbered 3 (emphasis added).

16    The only transactions between CRONIN and MONEX which would fit

17  this description would be the actual purchase of coins taken by

18  CRONIN into his physical possession. MONEX's "short" transactions

19  program is clearly subject to the regulation of the Commodities

20  Futures Trading Commission as just noted. (Even "long" transactions

21  where the metals were stored with third party institutions would be

22  subject to the regulation of the Commodities Futures Trading

23  Commission given the absence of contemporaneous physical delivery

24  to the client at time of purchase).

25    Thus, the arbitration clause cannot be construed as relating to

26  the matters in dispute between the parties since the short

27  transactions agreement and the transactions stemming therefrom,

28  were subject to regulation and the purported contract, read as a

- 12 -

whole, _expressly   excludes   such   transactions   (and   "long"_
_transactions   as   well   that   involved   storage   with   third   party_
_institutions)  from being subject to the purported contract_. Indeed,
the  purported  agreement  itself  is  labeled  "Purchase  and  Sale
Agreement" suggesting that it relates to conventional purchases and
sales  of  precious  metals  and  not  to  paper  transactions  that  do  not
contemplate  physical  delivery  of  the  metals  to  the  purchasing
party. The overall language of the contract also makes no reference
to the "short" transactions that are at issue herein or the concept
of making a profit in a declining market.

In _Smith v. Superior Court_, 202 Cal. App.2d 128, 20 Cal. Rptr.
512 (1962), arbitration was refused because the agreement between
the parties did not include a dissolution of partnership action:

> .  .  .  as stated in McCarroll v. Los Angeles County, etc.,
> Carpenters, 49 Cal.2d 45, 67, 315 P.2d 322: "The contract,
> however, _must be read as a whole_ and the grievance and
> arbitration procedure viewed in the light of its purpose." And
> at page 69, at page 335 of 315 P.2d: "As Mr. Justice Cardozo
> pointed out in Marchant v. Mead-Morrison Mfg. Co., 252 N.Y.
> 284, 169 N.E. 386, 391, 393, 'Courts are not at liberty to
> shirk the process of construction under the empire of a belief
> that arbitration is beneficent, any more than they may shirk
> it if their belief happens to be to the contrary. No one is
> under  a  duty  to  resort  to  these  conventional  tribunals,
> however helpful their processes, except to the extent he has
> signified his willingness. * * *' '[The contracting parties]
> *  *  *  are  not  to  be  trapped  by  a  strained  and  unnatural
> construction of words of doubtful import into an abandonment

1     of legal remedies, unwilled and unforeseen.'"

2   202 Cal. App.2d at 132 - 133, 20 Cal. Rptr. at 516 (emphasis

3   added). See also Parker v. Twentieth Century-Fox Film Corp., 118

4   Cal. App.3d 901, 173 Cal. Rptr. 639 (1981)(". . .[A]rbitration is

5   based on a contractual agreement to arbitrate and therefore the

6   courts must look to the wording and the scope of the arbitration

7   clause in the parties' contract to determine its application.")

8   State law controls as to whether the parties agreed to arbitrate a

9   certain matter. Metaclad Corp. v. Ventana Envtl. Organizational

10  P'tship, 109 Cal. App.4th 1705, 1712, 1 Cal. Rptr.3d 328, 33

11  (2003)(this case was cited by Defendants).

12      California law is clear that interpretation of a contract

13  requires that it be read as a whole.

14      EFFECT TO BE GIVEN TO EVERY PART OF CONTRACT. The whole of a

15      contract is to be taken together, so as to give effect to

16      every part, if reasonably practicable, each clause helping to

17      interpret the other.

18  California Civil Code § 1641. Defendants seek to ignore the

19  entirety of the purported agreement, focusing solely on the

20  arbitration provision. However, that provision cannot be viewed in

21  isolation and must be construed with regard to the entire contract:

22      As stated in Universal Sales Corp. v. Cal, etc., Mfg. Co., 20

23      Cal.2d 751, 760, 128 P.2d 665, even if one provision of a

24      contract is clear and explicit, it does not follow that that

25      portion alone must govern its interpretation; the whole of the

26      contract must be taken together so as to give effect to every

27      part. (Civ. Code § 1641.)

28  Alperson v. Mirisch Company, 250 Cal. App.2d 84, 90, 58 Cal. Rptr.

178, 182 (1967).

Defendants press what they consider to be a broad arbitration clause, but when other provisions of the contract make clear that the contract as a whole does not even apply to transactions that are subject to regulation by the Commodities Futures Trading Commission, transactions which are subject to such regulation should not be viewed as within the scope of the purported arbitration clause.

The transactions subject to regulations form a part of every cause of action in the First Amended Complaint. Accordingly, Defendants have failed to establish that the purported contract asserted contains an arbitration clause that would apply to the disputes between the parties. (Defendants also cannot claim that the oral agreement alleged as to the "short" program can be encompassed within the scope of their purported written agreement since their purported contract contains an integration clause (see Exhibit 1 to Harvey Kochen Declaration at 8, paragraph 15.3) permitting amendment only by a writing and CRONIN has no recollection of ever entering, let alone seeing, the purported contract so clearly the oral agreement could not have been considered to be a modification of the purported written contract in any event - - the parties' oral agreement as to short transactions covers subject matters not contemplated to be within the scope of the purported written contract.)

**V. EVEN ASSUMING SOLELY FOR ARGUMENT'S SAKE THAT A CONTRACT WITH AN ARBITRATION PROVISION HAD BEEN SHOWN AND THAT THE DISPUTES BETWEEN THE PARTIES WERE WITHIN THE SCOPE OF THAT AGREEMENT READING THE CONTRACT AS A WHOLE - - WHICH IS NOT THE CASE - - THE PURPORTED**

**ARBITRATION CLAUSE SHOULD BE DECLARED UNENFORCEABLE AS UNCONSCIONABLE.**

In <u>Baker v. Osborne Development Corporation</u>, 71 Cal. Rptr.3d 854, 861 (2008), the Court stated the following principle:

> . . . [T]he strong policy in favor of enforcing arbitration agreements does not arise until an enforceable agreement is established. [citation omitted]. In determining the enforceability of an arbitration agreement, generally applicable contract defenses, such as fraud, duress, and unconscionability apply. (Doctor's Associates v. Casarotto (1996) 517 U. S. 681, 687, 116 S. Ct. 1652, 134 L.Ed.2d 902.)
>
> . . . California law governs whether an arbitration agreement has been formed in the first instance, and whether an arbitration agreement exists is an issue for judicial determination. [citation omitted].
>
> When grounds exist at law or in equity for the revocation of arbitration agreements, courts may decline to enforce them (Ingle v. Circuit City Stores, Inc. (9th Cir. 2003) 328 F.3d 1165, 1170) and because unconscionability is a defense that applies generally to contracts, courts may refuse to enforce an unconscionable arbitration agreement. (Ibid.).

The evaluation of whether an arbitration clause is unconscionable involves evaluation of two factors known as procedural and substantive unconscionability:

> Unconscionability has both a procedural and substantive element. [Citation.] Both elements must be present for the court to invalidate a contract or clause, although the degree to which each must exist may vary. [Citation.]

Bruni, supra, 73 Cal. Rptr.3d at 409.

> . . . [P]rocedural and substantive unconscionability "need
> not be present in the same degree." Armendariz, 99 Cal.
> Rptr.2d 745, 6 P.3d at 690. "[T]he more substantively
> oppressive the contract terms, the less evidence of procedural
> unconscionability is required to come to the conclusion that
> the term is unenforceable, and vice versa." Id.

Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1106 (9th Cir. 2003). See also Harper v. Ultimo, 7 Cal. Rptr.3d 418, 422 (2003).

> "The procedural element of unconscionability focuses on two
> factors: oppression and surprise. [Citation.] '"Oppression"
> arises from an inequality in bargaining power which results in
> no real negotiation and "an absence of meaningful choice."'
> [Citation.] '"Surprise involves the extent to which the
> supposedly agreed-upon terms of the bargain are hidden in a
> prolix printed form drafted by the party seeking to enforce
> the disputed terms.' [Citation.]

Bruni, supra, 73 Cal. Rptr.3d at 409. See also Pardee Construction Co. v. Superior Court, 100 Cal. App.4th 1081, 1088, 123 Cal. Rptr.2d 288, 294 (2002)("'procedural unconscionability' concerns the manner in which the contract was negotiated and the circumstances of the parties at that time.") and Baker, supra at 862 ("Oppression arises when the parties have unequal bargaining power, leading to no real negotiation and lack of meaningful choice").

"Surprise" has also been referred to as the existence of a provision "which does not fall within the reasonable expectations of the weaker or 'adhering' party [and] will not be enforced

against him". <u>Hope v. Superior Court</u>, 122 Cal. App.3d 147, 152 - 153, 175 Cal. Rptr. 851, 855 (1981).

> "'The procedural element of an unconscionability contract generally takes the form of a contract of adhesion. . . .'" (Discover Bank v. Superior Court (2005) 36 Cal.4th 148, 160, 30 Cal. Rptr.3d 76, 113 P.3d 1100.) . . . 73 Cal.Rptr.3d 395.

> ""The term [contract of adhesion] signifies a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only to the opportunity to adhere to the contract or reject it.' [Citation.]" . . .

> "Although contracts of adhesion are generally enforceable according to their terms, a provision contained in such a contract cannot be enforced if it does not fall within the reasonable experience of the weaker or 'adhering' party. [Citations]"

> It is not entirely clear whether this principle is a subspecies of the doctrine of unconscionability or a separate doctrine. . . . Some cases have invalidated adhesion contract terms as beyond the reasonable expectations of the weaker party without any discussion of whether the terms were unconscionable. [Citations]. Nevertheless, failure to pass the "reasonable expectations" test is generally treated as the equivalent of substantive unconscionability. [Citation].

<u>Bruni</u>, <u>supra</u>, 73 Cal. Rptr.3d at 409 - 410.

The purported contract MONEX asserts is a lengthy document which sets forth arbitration provisions in inconspicuous, non-

capitalized and non-bolded language. The fact that CRONIN has no recollection of seeing any document of that nature let alone of reading or signing one, beyond raising the question above as to whether there even was a contract formed, establishes that this form contract, if presented to CRONIN at all, was presented on a take it or leave it basis with no opportunity to negotiate terms. See Baker, supra, at 862. The Declaration of Sherri Boland makes clear that MONEX desired that result and trained its employees to make presentation of contract documents a short shrift procedure and that as a matter of course arbitration was never mentioned to clientele in presenting contract documents. CRONIN had no familiarity with "short" transactions or with the type of contracts that would be used in that context. He was also an individual doing business with a large company with substantial staff and which had complete control over all transactions. His bargaining position was, therefore, inferior and there was clearly no opportunity provided to negotiate terms in any event.

The fact that CRONIN has never read any document like the one presented by Defendants also supports the presence of "surprise":

> Here, . . . plaintiffs are claiming that they never
> knowingly agreed to the arbitration provisions. As in most, if
> not all, adhesion contract cases, they deny ever reading them.
> The general rule "'that one who signs an instrument may not
> avoid the impact of the terms on the ground that he failed to
> read the instrument before signing it'" applies only in the
> absence of "overreaching'" (Stewart v. Preston Pipeline, Inc.
> (2005) 134 Cal. App.4th 1565, 1588, 36 Cal. Rptr.3d 901) or
> "'"imposition"'". (Jefferson v. Department of Youth Authority

(2002) 28 Cal.4th 299, 303, 121 Cal. Rptr.2d 391, 48 P.3d 423). Thus, it does not apply to an adhesion contract. [Citations]. Indeed, failure to read the contract helps "establish actual surprise. . . ." (Patterson v. ITT Consumer Financial Corp. (1993) 14 Cal. App.4th 1659, 1666, 18 Cal. Rptr.2d 563.)   73 Cal. Rptr.3d at 411.

. . . Evidence Code 622 . . . Does not bar an assertion of fraud or other grounds for rescission. [Citations]. This would be impermissible bootstrapping. For similar reasons it should not apply to recitals in an adhesion contract. (See City of Santa Cruz v. Pacific Gas & Electric Company (2000) 82 Cal. App.4th 1167, 1176 - 1177, 99 Cal. Rptr.2d 198 [Evid. Code, § 622 "is inapplicable in the procedural circumstances presented here. This is not a situation involving arm's length negotiations marked by the opportunity of both sides 'to accept, reject, or modify the terms of the agreement'"]. 73 Cal. Rptr.3d at 411.

Accordingly, whatever may be the case with respect to claims of unconscionability in general, here plaintiffs are asserting that they never actually agreed to the arbitration provisions. They cannot be required to arbitrate *anything* - - not even arbitrability - - until a court has made a threshold determination that they did, in fact, agree to arbitrate *something*.

Bruni, supra, 73 Cal. Rptr.3d at 411 - 412.

The arbitration provision in Bruni was found procedurally unconscionable because "[t]he arbitration provisions were part of a pre-printed form contract, presented on a take-it-or-leave-it

1  basis." Id. at 413. In addition, the arbitration provisions were
2  roughly one page of a 30-page booklet and the entire booklet was
3  single spaced in 10-point type with the arbitration provisions not
4  being "distinguished from the rest of the booklet by either bolding
5  or capitalization." Id. The plaintiffs were not asked to initial
6  the arbitration provisions. Id. Even though the " . . . application
7  did indicate - - in capital letters - - that the booklet contained
8  binding arbitration provisions; . . . it did not provide any
9  information as to their scope or effect." Id.

10      Here, the purported contract is lengthy and the arbitration
11  provisions are not bolded or capitalized, there are no initials
12  next to the arbitration provisions, and no arbitration agreement
13  was ever raised with CRONIN. The title of the purported contract is
14  also misleading in inferring that it would relate only to a
15  straight forward purchase of coins rather than a speculative "bet"
16  on whether the price of silver would drop. See Baker, supra at 862.
17  The fact that the language of the agreement excludes from the
18  purported contract's scope transactions that are required to be
19  regulated by the Commodities Futures Trade Association also
20  constitutes surprise since such transactions could not be
21  contemplated to be within the scope of the arbitration agreement.
22  Furthermore, assuming Defendants' position as to the breadth of the
23  arbitration clause in this case is correct - - which is denied - -
24  the breadth of the clause would be "unforeseeably broad" (Bruni, 73
25  Cal. Rptr.3d at 414) as, according to Defendants, it seeks to
26  include any and all disputes of any kind between the parties
27  whether known or contemplated when the supposed contract was
28  entered, or not. In addition, the fact that the purported

arbitration provision was obscured in a prolix pre-printed form drafted by MONEX is also supportive of surprise. "Baker v. Osborne Development Corp., 71 Cal. Rptr.3d 854, 862 (2008). The failure to append the JAMS arbitration rules, with which CRONIN is unfamiliar and the fact that the most current version of those Rules are to be used so that there can be prospective changes as to what rights the arbitration will provide also support procedural unconscionability. Harper v. Ultimo, 113 Cal. App.4th 1402, 7 Cal. Rptr.3d 418 (2003).

In short, all of the foregoing point to procedural unconscionability.

The substantive element of unconscionability "focuses on the actual terms of the agreement and evaluates whether they create ""'overly harsh'"" or ""'one-sided'" results [citation], and that is, whether contractual provisions reallocate risks in an objectively unreasonable or unexpected manner. [Citation.] Baker, supra at 862.

The arbitration clause is "overly harsh" in that in this situation extensive discovery is required to procure relevant documents and information from Defendants, but Defendants have selected a set of arbitration rules that limit discovery - - there is no right under JAMS Rules to propound document demands or interrogatories and there is no provision under those rules for subpoening records of third parties, all of which are needed to expose the full extent of Defendants' wrongful conduct. Depositions are also limited to one per side without leave of the arbitration panel. See Declaration of Einar Wm. Johnson attached hereto.

This circumstance also ties into the issue of one-sideness. The only conceivable claim that CRONIN could have been pursued for by MONEX would be a claim for monies owed should he have failed to

meet any payment obligations. MONEX had complete control over every transaction, providing buyers and sellers as needed (or filling that role itself) and making representations as to the existence of precious metals supposedly being bought and sold. Defendants, not CRONIN, were vulnerable to liability for failing to comply with Federal statutory provisions relating to commodity futures (a fact that Defendants sought to suppress in the purported contract by claiming the transactions at issue were not subject to such regulation). It was only Defendants that could be sued for fraud and breach of fiduciary duty, not Plaintiff. Such one-sidedness has been found to support substantive unconscionability:

. . . in Ingle v. Circuit City Stores, Inc., supra, 328 F.2d at page 1174, the court held that an arbitration provision in an employment contract was unconscionable "because the possibility that Circuit City would initiate an action against one of its employees is so remote, the lucre of the arbitration agreement flows one way; the employee relinquishes rights while the employer generally reaps the benefits of arbitrating its employment disputes." (See also Ting v. AT&T (9th Cir.2003) 319 F.3d 1126, 1149 - 1150 [finding a provision that prohibitted arbitration of class-wide claims unconscionable because it was "difficult to imagine AT&T bringing a class action against its own customers," and AT&T had "failed to allege that it has ever or would ever do so"].)

The arbitration clause in the present case was similarly one-sided - - Osborne, as the builder and seller of plaintiffs' home, would have no conceivable reason to institute legal proceedings against a homeowner after escrow

closed, but virtually every claim the homeowners might raise against not only the builder, but also against the subcontractors, materialmen, and others in any way involved in the construction of plaintiffs' home would be subject to arbitration.

Baker, supra, 73 Cal. Rptr.3d at 863 - 864. See also Harper, supra at 423 ("The odds were far more likely that the customers would have claims in addition to just getting their money back than the business would have claims in addition to just getting paid.") and Bruni, supra at 40 ("[T]he protections provided to the builder under this agreement far exceeded those benefits provided to the home purchaser. . . . The results of this agreement are too one-sided not to be found unconscionable.")

Further, although plaintiffs may "certainly" waive their constitutional right to a jury trial, "'the right to pursue claims in a judicial forum is a substantial right and one not lightly to be deemed waived.'" [Citations]. Hence, before upholding the provisions of the parties' agreements purporting to effect a waiver of plaintiffs' constitutional right to trial by jury, we must closely scrutinize the impact of the waiver on the parties. Although in an appropriate case such waiver might be advantageous to plaintiffs as providing efficiencies of speed and economy not always afforded in a jury trial, nothing in the record suggests this is such a case. . . .

. . . [N]othing in the record suggests that buyers otherwise gained anything from waiving their substantive constitutional right to a jury trial. . . . Thus, as giving buyers nothing in

return for such waiver, the judicial reference provisions of the parties' were so one-sided as to be substantively unconscionable.

Pardee, supra, 100 Cal. App.4th at 1091, 123 Cal. Rptr. at 296

Here, the asserted arbitration clause is not only one-sided as to MONEX, as illustrated above, it also purports to apply to partners, employees, etc., of MONEX even though those individuals would have no basis at all for suing CRONIN. CRONIN received nothing of value in exchange for the purported waiver of his right to a jury trial. (". . .[W]here there is doubt surrounding whether a party waived his or her right to jury trial, the doubt should be resolved in favor of preserving that right". Maganallez, supra at 602.) Accordingly, substantive unconscionability is established.

**VI. THERE IS NO BASIS TO STAY THE ACTION.**

Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp., 981 F.2d 752, 754 (5th Cir. 1993) clearly recites there should only be a stay of matters within the reach of the arbitration agreement. Since no agreement has been established and the purported agreement asserted would not cover the issues in dispute in any event and the asserted arbitration clause is unconscionable in any event, there is no basis for arbitration and, consequently, no basis for a stay of this action.

Based on the foregoing, Defendants' Motion should be denied.

Dated: January 16, 2009

JOHNSON AND ASSOCIATES

By: _____
Einar Wm. Johnson
Attorneys For Plaintiff
DARTY CRONIN

# DECLARATION OF DARTY CRONIN

I, Darty Cronin, declare:

    1.  That I am an individual residing in the County of Los Angeles, State of California. I am the Plaintiff in this action.

    2.  In or about June of 2007, I saw an ad that was being run by Defendant MONEX DEPOSIT COMPANY ("MONEX") offering gold coins for sale. I had a gentleman by the name of Howard Lewis contact MONEX and he provided me with the name of Sherri Boland, a MONEX representative. I ordered substantial quantities of gold coins (ultimately approximately $2,000,000 worth) from MONEX through Sherri Boland for physical delivery. Mr. Lewis and I went to MONEX in or about June of 2007 to pick up my coins. I met Sherri Boland in person at that time.

    3.  Ms. Boland told me about an investment opportunity that was different than just purchasing and holding precious metals (what I understand MONEX to describe as its "long" program where conventional purchases of precious metals could be made  where large quantities of precious metals could be purchased without taking physical delivery of the product as the product was supposed to be stored on behalf of the purchaser at third party institutions). Specifically I was told by Ms. Boland about what she called a "short" program or "going short" whereunder I could make money by betting on whether silver would decline in value.  I had never participated in such a program before, but was told by Ms. Boland that she had an 80% success rate with her investment strategies and that she would be happy to assist me if I so desired. I asked for references to verify her representation and departed with my purchased coins.

.

    4.  Thereafter I contacted the references who confirmed that Ms. Boland was competent and provided excellent investment advice; she was highly recommended.

5.  After checking the references, upon returning to MONEX to pick up more coins, I talked further with Ms. Boland about investment strategies. She further discussed the short program whereunder  I could commit to MONEX to sell "borrowed" silver at a specified price and in a specified quantity and that under this program MONEX would assure me that it would arrange and assure the purchase of the silver at that price through an undisclosed purchaser and that at any time in the future that I determined to buy the silver to cover the sale MONEX would produce a seller at the then existing market price. Accordingly, on a date certain I could lock in a sales price for silver at the then prevailing rate in a specified amount, but without having to cover the sale at that time, and could buy the silver to cover the sale at a future time of my own choosing at the market rate prevailing at the time of the election so that if the price of silver went down after my commitment to sell the "borrowed" silver I would make a profit based on the "bet" that the price of silver would drop. The means through which MONEX could permit this program to operate were unknown to me as they were never explained to me. Only the concept that I could make a profit in a declining market on the terms just described was explained. Under this program there was no physical transfer of silver from seller to buyer, as had been the case with my purchase of the gold coins, and I am informed and believe that a "short" transaction was either literally a paper transaction with no silver to back it or was for all practical purposes strictly a paper transaction, the value of which turned on the outcome of "betting" on market trends over time.

6.  I told Ms. Boland that I wanted to participate in the "short" program and entered an oral contract with MONEX, through Ms. Boland, to participate in the short program. The terms of that agreement were as follows: 1) my account would be handled by an account representative who would formulate and provide to me an investment strategy - - i.e., whether to take conventional positions in silver or whether to invest my monies in the "short" program wherein I could speculate on whether the price of silver would drop, 2) my account representative would have my best interest at heart, 3) that MONEX, through its sole efforts, outside of my control, would guaranty that at any point in time that I decided to make the "purchase" to offset the "sale" of the "borrowed" silver, there would be a seller available for me buy at the then prevailing market rates which would then cover

- 2 -

the "sale" of the "borrowed" silver - - in short, MONEX assured me, through Ms. Boland, that through its efforts I would be able to sell high and buy low through this deferred form of transaction if the silver market dropped, and 4) that I would go "short" with the intent of making a profit based on pure speculation as to fluctuations in the price of silver subject only to the risk that silver market rates might rise instead of fall. At no time was there ever any discussion with me of having any dispute of any kind with MONEX submitted to arbitration and there was never any discussion of my giving up any of my rights to go to court and have a jury decide any claims I might have against MONEX.

7. I have never met an individual by the name of Harvey Kochen. I do not recall signing any documentation for MONEX or being presented any documentation for signature by MONEX other than acknowledgment of receipt of my coins. I do not recall ever seeing, reading, or signing the documents that are appended to the Declaration of Harvey Kochen. I am also not familiar with the kind of documentation, if any, that would normally be utilized in engaging in the types of transactions I engaged in with MONEX and, as noted above, I had never been involved in a program like the short program described above. I am not familiar with an organization known as "JAMS" and am not familiar with the arbitration rules of that organization.

If called as a witness I could and would so testify of my own personal knowledge except as to those matters as to which I have attested under information and belief and as to those matters I could so testify on information and belief. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed at _____, California, this ____ day of January, 2009.

Darty Cronin

- 3 -

the "sale" of the "borrowed" silver - - in short, MONEX assured me, through Ms. Boland, that through its efforts I would be able to sell high and buy low through this deferred form of transaction if the silver market dropped, and 4) that I would go "short" with the intent of making a profit based on pure speculation as to fluctuations in the price of silver subject only to the risk that silver market rates might rise instead of fall. At no time was there ever any discussion with me of having any dispute of any kind with MONEX submitted to arbitration and there was never any discussion of my giving up any of my rights to go to court and have a jury decide any claims I might have against MONEX.

7.  I have never met an individual by the name of Harvey Kochen. I do not recall signing any documentation for MONEX or being presented any documentation for signature by MONEX other than acknowledgment of receipt of my coins. I do not recall ever seeing, reading, or signing the documents that are appended to the Declaration of Harvey Kochen. I am also not familiar with the kind of documentation, if any, that would normally be utilized in engaging in the types of transactions I engaged in with MONEX and, as noted above, I had never been involved in a program like the short program described above. I am not familiar with an organization known as "JAMS" and am not familiar with the arbitration rules of that organization.

If called as a witness I could and would so testify of my own personal knowledge except as to those matters as to which I have attested under information and belief and as to those matters I could so testify on information and belief. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed at _____, California, this _____ day of January, 2009.

Darty Cronin

**DECLARATION OF SHERRI BOLAND**

I, Sherri Boland, declare:

    1.   That I am an individual residing in the Inland Empire,  State  of  California.  I  was  the account representative for Darty Cronin while employed by MONEX DEPOSIT COMPANY ("MONEX").  I was a MONEX employee from July 5, 2006 to July 18, 2008.

    2.   In or about June of 2007, I received a phone call from Howard Lewis and thereafter Darty Cronin came to MONEX's offices to order from MONEX 30 gold coins. (Mr. Cronin ultimately purchased approximately $2,000,000 in gold coins from MONEX). When Mr. Cronin first came in to order coins I met him in person. During that encounter I told Mr. Cronin about the opportunity to take advantage of the market by trading silver and gold with the option of going either long or short. I told Mr. Cronin about what MONEX called a "short" program or "going short" whereunder he could make money by "betting" on whether silver would decline in value.  I told Mr. Cronin that I was a confident rep in my investment strategies and that MONEX's Vice President was a very good analyst and that I could handle his coins for delivery as well as assist him in his trading account, either long or short.

    3.   When Mr. Cronin returned to MONEX to pick up his coin order, I talked further with him about the short program whereunder he could commit to MONEX to sell "borrowed" silver at a specified price and in a specified quantity and that under this program MONEX would assure him that it would arrange and assure the purchase of the silver at that price through an undisclosed purchaser and that at any time in the future that he determined to buy the silver to cover the sale MONEX would cover the purchase (produce a seller) at the then existing market price. Accordingly, on a date certain he could lock in a sales price for silver at the then prevailing rate in a specified amount, but without having to cover the sale at that time, and could buy the silver to cover the sale at a future time of his  own choosing at the market rate prevailing at the time or a preset market rate

- 1 -

(buy limit) so that if the price of silver went down after his commitment to sell the "borrowed" silver he would make a profit based on the "bet" that the price of silver would drop.

4. Mr. Cronin told me that at a future time he wanted to participate in the "short" program on the terms described above and I told him I would obtain the necessary approvals from my superiors for him to do so. After obtaining approval from my superiors, Mr. Cronin's first short transaction was set up several weeks later.

5. At no time was Mr. Cronin introduced to Harvey Kochen.

6. As part of my MONEX training I was supposed to procure client signatures on contract documents of the nature appended to Harvey Kochen's Declaration. I have no specific recollection of procuring Mr. Cronin's signature on such documents. Had I done so I would have followed my training procedure which was to advise the client that the documents were required by MONEX, that the client was to peruse and sign the contract. Neither I, nor other reps, were ever instructed to, and it was not my practice to, advise a client presented with a contract document about the arbitration provisions contained in the contract documents - - the only time I heard discussions at MONEX regarding the arbitration clauses was after a dispute arose with a company client. I cannot provide a legal analysis as to what kind of transactions offered by MONEX the documents were written to cover, but I know that it was part of my job to procure client signatures on such documents in the manner described. It was also my experience and training with MONEX that these documents were presented on a "take it or leave it" basis with no opportunity for the client to negotiate terms.

If called as a witness I could and would so testify of my own personal knowledge except as to those matters as to which I have attested under information and belief and as to those matters I could so testify on information and belief. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed at

01/29/1994  03:05     310-783-0070              JOHNSON & ASSOCIATES              PAGE  04

Newport Beach, California, this 16th day of January, 2009.

Sherri Boland

~ 3 ~

_____, California, this _____ day of January, 2009.

_____
Sherri Boland

## DECLARATION OF EINAR Wm. JOHNSON

I, Einar Wm. Johnson, declare:

1. That I am an attorney licensed to practice in the State of California and am admitted to practice before this Court and am in good standing. I am the owner and founder of the law offices known as Johnson And Associates attorneys for Plaintiff herein.

2. I am familiar with this case as lead counsel and consider the ability to propound document demands and interrogatories on defendants, to subpoena third parties for records, and to take multiple depositions of paramount importance to the preparation of this case. I have reviewed the JAMS rules for arbitration and they do not provide a right to propound document demands or interrogatories, do not reference the ability to subpoena third parties, and allow for only one deposition per side without leave of the arbitration panel. I consider these limitations highly prejudicial to my client under the facts of this case.

If called as a witness I could and would so testify of my own personal knowledge except as to those matters as to which I have attested under information and belief and as to those matters I could so testify on information and belief. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed at Torrance, California, this 16th day of January, 2009.

Einar Wm. Johnson

- 1 -

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 2370 W. Carson Street, Suite 141, Torrance, California 90501.

On January 16, 2009, I served the foregoing document described as OPPOSITION TO MOTION TO COMPEL ARBITRATION AND FOR AN ORDER STAYING THIS ACTION; DECLARATION OF DARTY CRONIN, DECLARATION OF SHERRi BOLAND, DECLARATION OF EINAR Wm. JOHNSON on the interested parties in this action by placing a true correct copy thereof enclosed in sealed envelopes addressed as follows, and by placing said envelopes in the United States Mail with postage pre-paid, at Torrance, California:

Thomas A. Pistone
Pistone & Wolder
2020 Main Street, Suite 900
Irvine, California 92614-8203

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Dated: January 16, 2009

Einar Wm. Johnson