O/JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No. SACV 08-1297 DOC (MLGx)                                      Date: February 17, 2009

Title: DARTY CRONIN V. MONEX DEPOSIT COMPANY, ET AL.

DOCKET ENTRY
  [I hereby certify that this document was served by first class mail or Government messenger service, postage prepaid, to all counsel (or parties) at their respective most recent address of record in this action on this date.]
                                                  Date:_____  Deputy Clerk: _____

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

  Kristee Hopkins                                              Not Present
  Courtroom Clerk                                              Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                                                  NONE PRESENT

PROCEEDING (IN CHAMBERS): ORDER GRANTING MOTION TO COMPEL ARBITRATION

      Before the Court is Defendants Monex Deposit Company ("MDC"), Louis Carabini, Michael Carabini, Mike Moroni, David Gala, and Dan J. C. Wales' (collectively "Defendants") Motion to Compel Arbitration and for an Order Staying this Action.  The Court finds the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set February 23, 2009 is removed from the Court's calendar. After considering the moving, opposing, and replying papers thereon, and for the reasons stated below, the Court hereby GRANTS the Motion to Compel Arbitration and Stay this Action.

**I.    BACKGROUND**

      Plaintiff Darty Cronin ("Cronin") alleges that Defendant MDC, an entity in the retail precious metal business, and the other named individual defendants entered into a conspiracy to engage in the silvers futures market without becoming members of a commission-designated board of trade as

required by federal law. Cronin claims that the Defendants did so with the intent of divesting investors of their monies for Defendants' personal gain. Specifically, Cronin alleges that Defendants managed his account in a manner calculated to cause him to lose money and to allow Defendants to gain profits for themselves. In doing so, Plaintiff alleges that Defendants made misrepresentations to him that ultimately caused Plaintiff to lose in excess of 6.3 million dollars.

Plaintiff contends that he first entered into a transaction with MDC by purchasing two-million dollars worth of gold coins of which he immediately took physical possession through MDC account representative Sherri Boland. He then claims that after entering into this so-called conventional precious metal transaction, he met with Boland who told him about another type of investment option offered by MDC referred to as "going short" in which Cronin could try to make money by speculating on the declining value of silver. While Cronin's First Amended Complaint indicates that he initially may have entered into a written agreement with MDC, he claims that this subsequent decision to "go short" based on Boland's investment advise was pursuant to a later oral agreement.

In "going short," Cronin contends that he was told he could profit by betting on the declining value of silver. Based on his representations, it appears he was told that he could borrow silver commodities from MDC and lock-in a particular sale price for a future sale, though Cronin would not have to personally purchase the silver at that time. Then, if the present value of silver dropped, Cronin could purchase the silver at the lower market rate and sell it to a buyer provided by MDC at the previously locked-in higher sale price, and thus make a profit. Cronin argues that these are illegal futures contracts. Further, Boland was then allegedly terminated in mid-July 2008, and Cronin alleges that his new account representative, Defendant Wales, convinced him to change his investment position knowing that such a change would involve a significant loss to Cronin and a major financial gain for Defendants.

Plaintiff's First Amended Complaint alleges causes of action against Defendants for: (1) Fraud under Commodity Futures Modernization Act of 2000, (2) Common Law Fraud, (3) Breach of Contract, (4) Negligent Misrepresentation, (5) Constructive Fraud, and (6) Common Count for Money Had and Received.

Defendants contend that at the outset of the parties' relationship they entered into two written account agreements with Cronin on June 20, 2007 (the MDC Purchase and Sale Agreement and the affiliated Monex Credit Company's Loan, Security and Storage Agreement). Section 15.11., subsections a through b, of the Purchase and Sale Agreement allegedly entered into between Plaintiff and Monex Deposit Company states as follows:

> a. **Arbitration of Claims**. The parties agree that this Agreement and the transactions entered into pursuant to it are commercial in nature and do not involve consumer transactions. The parties agree that any and all disputes,

claims or controversies arising out of or relating to any transaction between them or to the breach, termination, enforcement, interpretation or validity of this Agreement, including the determination of the scope or applicability of this agreement to arbitrate, shall be submitted to final and binding arbitration before JAMS, or its successor, in Orange County, California, in accordance with the laws of the State of California for agreements made in and to be performed in California (including, without limitation, the California Arbitration Act).

b.  **Additional Parties to this Agreement to Arbitrate**.  All partners of MDC and their officers and directors, and all employees, representatives, agents and affiliates of MDC, past, present or future, are parties to this arbitration agreement to the extent they are named as respondents in any dispute, claim or controversy subject to this Agreement.

Further Section 16.n., directly preceding the signature box for the agreement states: "**I have read and understand the foregoing and agree to submission of all disputes, claims or controversies arising out of or relating to my transactions with MDC or to this Agreement to neutral arbitration in accordance with the provisions of this Agreements. (See Sec. 15.11)**"

Defendants brought the instant motion to enforce the terms of the arbitration clause. Plaintiff raises a number of arguments, as detailed below, regarding why the arbitration clause does not apply or otherwise should not be enforced.

## II.    LEGAL STANDARD

The Federal Arbitration Act (FAA) requires courts to enforce arbitration clauses in private contracts involving maritime and interstate commerce.  9 U.S.C. § 2; *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 472, 109 S. Ct. 1248 (1989).  The Act "does not mandate the arbitration of all claims, but merely the enforcement . . . of privately negotiated arbitration agreements."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219, 105 S. Ct. 1238 (1985).  The legislative intent of the Act is to enhance judicial economy by placing an arbitration agreement "upon the same footing as other contracts, where it belongs."  H.R. Rep. No. 96, 68th Cong., 1st Sess., 1-2 (1924).  The FAA embodies a "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary."  *Perry v. Thomas*, 482 U.S. 483, 489, 107 S. Ct. 2520 (1987).

Arbitration under the FAA is consensual and proceeds according to the parties' terms in the agreement.  As such, parties may specify in the contract the issues subject to arbitration and the rules under which arbitration is conducted.  *Volt Info. Scis.*, 489 U.S. at 479 (citing *Mitsubishi Motors Corp v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628, 105 S. Ct. 3346 (1985)); *EEOC v. Waffle House*,

534 U.S. 279, 293-94, 122 S. Ct. 754 (2002). In addition, statutory substantive rights are unaffected by an agreement to arbitrate. *Mitsubishi Motors Corp.*, 473 U.S. at 628 (holding that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afford by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum").

Given the federal policy in favor of arbitration clauses, the court must give effect to the arbitration clause unless the contract is invalid or unenforceable under state contract law. *See Perry*, 482 U.S. at 492. "A court may not, then, in assessing the rights of the litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law." *Id.* Thus, if the contract containing the arbitration clause is not enforceable as a matter of state contract law, or if no agreement to arbitrate was ever actually entered into, the contract and clause are not binding and the dispute need not be sent to arbitration. *See id.*

## III. DISCUSSION

Plaintiff makes three arguments against arbitration. First, he claims that he cannot recall entering into an agreement to arbitrate. Second, he claims that even if he entered into such an agreement, the instant dispute between the parties is beyond the scope of that agreement. Third, he argues that even if the dispute falls within the provisions of the agreement, the arbitration clause is unconscionable and thus unenforceable.

### a. Arbitration Agreement

#### 1. Existence of a Valid Agreement

Plaintiff first argues that Defendants have not properly "authenticated" that the parties entered into a written arbitration agreement. Plaintiff is correct that the burden is on Defendants to prove the existence of a valid agreement. *See Giuliano v. Inland Empire Personnel, Inc.*, 149 Cal. App. 4th 1276, 1284 (2007) ("'[t]he petitioner bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence" (*quoting Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 972 (1997))).

Plaintiff's primary arguments are that: (1) he cannot remember signing or reading the Purchase and Sale Agreement; and (2) Harvey Kochen, Director of Compliance for MDC, is not the proper party to attest to the agreement because, in summary, Kochen can neither claim that Cronin signed the agreement in Kochen's presence nor does Kochen claim that he (Kochen) signed the purported agreement. The Court, however, considers Plaintiff's arguments deficient for a number of reasons and finds that Defendants have met their burden of showing that Cronin and Defendants entered into a written arbitration agreement.

First, in Plaintiff's complaint and in reference to the written agreement, Plaintiff states the following: "Plaintiff is informed and *believes that he signed a written contract* with MONEX relating to standard purchases of precious metals from MONEX and standard sales of precious metals to MONEX, though Plaintiff does not recall doing so." FAC ¶ 14 (emphasis added).  The Court reads Plaintiff's FAC as an admission that he signed the contract, notwithstanding that he also claims to "not recall" signing the agreement.  Further, as Defendants point out, the signature on the Purchase and Sale Agreement appears to match the signature that Cronin includes on his signed declaration attached to his opposition to the instant motion.  Also, even in Plaintiff's opposition, he does not clearly state that he did not sign the agreement or claim that the signature on the Purchase and Sale Agreement is not his.  Instead, he primarily claims that he cannot *remember* signing it, a distinction this Court finds dispositive.

Further, Defendants provide ample evidence that in the ordinary course of business they enter into written agreements with customers at the outset of the parties' relationship.  First, as to Kochen's Declaration in Support of the Motion to Compel, Kochen does not claim that he personally met Cronin or signed the agreement in question.  Instead, he merely indicates that part of his job duties include reviewing new customer accounts and that he can attest to reviewing the agreement signed by Cronin on June 20, 2007.  Further, in response to Plaintiff's arguments and in support of their Reply, Defendants provide the Declaration of Gregory G. Walker, in-house counsel to Monex Deposit Company and Monex Credit Company ("MCC").  Walker indicates that it is MDC's policy that its customers must sign both MDC's and MCC's respective account agreements prior to financing purchases or borrowing commodities at MDC as Plaintiff did.  Further, he represents that his signature is included on the Purchase and Sale Agreement that also includes Cronin's signature.

In addition, even the declaration of Plaintiff's initial account representative, Sherri Boland, that Plaintiff provides in support of his opposition supports Defendants' argument that they always enter into written agreements with their customers.  Boland states, "As part of my MONEX training I was supposed to procure client signatures on contract documents of the nature appended to Harvey Kochen's Declaration.  I have no specific recollection of procuring Mr. Cronin's signature on such documents.  Had I done so I would have followed my training procedure which was to advise the client that the documents were required by MONEX, that the client was to peruse and sign the contract."  Thus, Boland also admits that this procedure was standard.  Further, she, too, does not actually say that she did not procure Cronin's signature.  Instead, she states that she cannot remember if she did.

As a result of this evidence, the Court finds that the parties entered into a written contract that included an arbitration clause.

### 2. Scope of the Agreement

Plaintiff also argues that even assuming he entered into a written contract that was

knowingly signed by all parties, the dispute between the parties is not within the scope of the purported agreement and thus is not subject to arbitration. Specifically, he states that the trades at issue took place pursuant to a later oral agreement, outside of the two written MDC and MCC account agreements, and that the oral agreement did not include an arbitration clause. However, the Court considers two primary reasons why this argument is unavailing.

First, the arbitration provision here is extremely broad, as it requires arbitration of "any and all disputes, claims or controversies arising out of or relating to *any transaction* between them *or* to the breach, termination, enforcement, interpretation or validity of this Agreement" to be subject to arbitration. (emphasis added) *See Chiron Corp. v. Ortho Diagnostics Sys., Inc.*, 207 F.3d 1126, 1131 (9th Cir. 2000) (describing such language as "broad and far-reaching"); *see also Fleet Tire Serv. of North Little Rock v. Oliver Rubber Co.*, 118 F.3d 619, 621 (8th Cir. 1997) (indicating that the language arising out of or relating "constitutes the broadest language the parties could reasonably use to subject their disputes" to arbitration). Here, the dispute clearly relates to a transaction entered into between MDC and Plaintiff, regardless of whether the transaction was the kind of transaction contemplated by the written agreement. Further, to the extent there is a separate, later oral agreement also related to trading precious metal, case law suggests that where that additional agreement is associated with the agreement containing an arbitration clause, arbitration can still be enforced based on the broad "relating to" language. *See Drews Distributing, Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 350 (4th Cir. 2001) (broad arbitration agreement utilizing "related to" language covered dispute arising out of earlier agreement between the parties that did not expressly include arbitration provision); *see also, Zink v. Merrill Lynch Peirce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993) (holding arbitration clause in account agreement between investor and securities broker applied to dispute arising from bond transactions that occurred prior to execution of agreement because: (1) contract language said any dispute between the parties arising out of investor's business *or* agreement would be submitted to arbitration, and (2) inclusion of disputes arising out of investor's business demonstrated intent to arbitrate more than just specific matters set forth in the written agreement) . Here, even if the original written agreement contemplated certain types of trades and the later agreement allowed for new kinds of trade in precious metals, the agreements would appear to relate to each other.

Further, it is not entirely clear that the written agreement does not capture the trades at issue, as Plaintiff would have the Court believe. Plaintiff argues that the written Purchase and Sale Agreement only covers so-called "conventional" purchases and sales of precious metals like his original purchase of two-million dollars worth of gold coins in which he paid for and immediately took physical possession of the coins. Plaintiff then argues that the oral contract covered transactions that allowed him to speculate on the declining value of silver and make trades using borrowed commodities based on locked-in sale or purchase prices that did not necessarily match the present-value of silver.[1]

---

[1] Plaintiff argues that such trades are illegal futures contracts subject to regulation by the Commodity Futures Trading Commission ("CFTC") while Defendants argue to the contrary, providing ample evidence that the CFTC has analyzed MDC's trading programs

However, the Purchase and Sale Agreement does appear to contemplate these types of transactions, or at least transactions that substantially deviate from the so-called "conventional" transactions. First of all, the purpose of the MCC Account Agreement required to be executed in conjunction with the Purchase and Sale Agreement (also signed by Plaintiff based on the same arguments regarding the Purchase and Sale Agreement), is to allow MDC customers to engage in financed transactions or borrow commodities. Further, the MDC Purchase and Sale Agreement details three types of purchase and sale orders that MDC may allow its customers to engage in called Limit, Stop, and Stop-Limit Orders. *See* Section 11. These transactions appear to involve a similar model to the transactions Plaintiff contends he entered into pursuant to his alleged oral agreement. For example, the general description of these three types of orders provides that "[u]nder certain conditions, MDC will accept orders for purchases or sales of commodities to be executed at prices which are higher or lower than its prevailing quoted market prices (limit, stop and stop-limit orders). Unless otherwise specified, limit, stop and stop-limit orders are effective for thirty calendar days." Purchase and Sale Agreement, Section 11. Due to the similarity between these articulated trading arrangements and the transactions Plaintiff contends were the basis of an alleged later oral agreement, the Court finds that the disputed transactions fall within the scope of the arbitration clause.

And, as Defendants point out, it is undisputed that the named individual defendants other than MDC were or are "agents, representatives or employees of Monex," thus requiring claims against them to also be arbitrated.

Second, in this case, the arbitration clause specifically states that "the determination of the scope or applicability of this agreement to arbitrate, shall be submitted to final and binding arbitration...." Purchases and Sale Agreement, Section 15.11.a. Thus, according to the parties' agreement, this Court is not actually the proper body to decide whether the disputes are subject to arbitration in the first instance (i.e. if the disputes fall within the scope of the arbitration clause). As Defendants point out, where the parties "'clear[ly] and unmistakabl[y]" assign determination of the arbitration agreements's scope to the arbitrator, the court must allow the arbitrator to make that determination. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45, 115 S. Ct. 1920 (1995); *see also* Cal. Civ. Code § 1638 (the court must ascertain the parties' intent from the plain language of the contract if that language is "clear and explicit"). The Court finds that the plain language of the contract clearly and unmistakably indicates that the arbitrator must decide the scope and applicability of the arbitration clause to the parties' dispute. As a result, this Court need not actually resolve whether these are illegal future contracts outside the scope of the Purchase and Sale Agreement (a contested

---

and determined that they do not involve futures contracts. Because the Purchase and Sale Agreement says that MDC's trades are not subject to regulation by the CFTC, Plaintiff also argues that the trades are beyond the scope of the agreement. However, the Court feels that it need not resolve the actual merits of Plaintiff's claim that the transactions are futures contracts. Instead, the Court must determine whether are not the transactions *as described* could fall within the scope of agreement.

point as stated in footnote 1 that goes to the merits of Plaintiff's claim). Instead, the plain language of the arbitration provisions within the Purchase and Sale Agreement indicate that an arbitrator should first decide whether the arbitration clause applies to a dispute between the parties regarding a particular transaction.

    **b.**    **Unconscionability**

Assuming *arguendo* that the parties entered into an arbitration agreement and that their disputes are within the scope of the agreement, Plaintiff finally argues that the arbitration provision is unconscionable. Contract defenses such as unconscionability may be used to invalidate an arbitration clause. *See Doctor's Assocs.'s Inc. v. Casarotto*, 517 U.S. 681, 686, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902 (1996). "[A] party opposing the petition [to compel] arbitration bears the burden of proving by a preponderance of the evidence any fact necessary to its defense." *Guiliano v. Inland Empire Personnel, Inc.*, 149 Cal. App. 4th 1276, 1284 (2007). On a motion to compel arbitration, a court cannot consider whether the contract as a whole is unconscionable. Instead, a court is limited to considering whether the arbitration clause in the agreement is unconscionable. *See Colfax Envelope Corp. v. Local 458-3M, Chicago Graphic Communications Int'l Union*, 20 F.3d 750, 754 (7th Cir. 1994). An adhesion contract is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Neal v. State Farm Ins. Cos.*, 188 cal. App. 2d 690, 694 (1961). An adhesion contract is unconscionable when both procedural unconscionability, meaning surprise or distress stemming from unequal bargaining power, and substantive unsconscionability, meaning overly harsh or one-sided terms, are present. *See Armendariz v. Foundation Health Psychare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). However, procedural and substantive unconscionability "need not be present in the same degree." *Id*.

    **1.**    **Procedural Unconscionability**

Procedural unconscionability typically refers to two factors: oppression and surprise. *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1288 (2008). "'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Id*. (*quoting Aron v. U-Haul Co. Of Calif.* 143 Cal. App. 4th 796, 808 (2006)).

The Court finds that Plaintiff has not shown procedural unconscionability. As Defendants point out, "There can be no oppression establishing procedural unconscionability, even assuming unequal bargaining power and an adhesion contract, when the customer has meaningful choices." *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 482 (2006). Here, Defendants indicate that they compete with many companies speculating and trading in precious metals, such as Goldline International Inc., Kitco, and USA Gold (Centennial Precious Metals), with which Plaintiff could have

dealt in trading precious metals.  Thus, any claim that he had to agree to the contract on a "take it or leave it basis" loses force when Plaintiff was clearly presented with other trading options.

Second, Plaintiff has not made an adequate showing of surprise.  Plaintiff argues that the arbitration clause is buried in a "lengthy document" and that the clause is "inconspicuous, non-capitalized and non-bolded."  However, the Court finds this reading of the arbitration clause inaccurate.  The Purchase and Sale Agreement containing the relevant arbitration clause is only eight pages.  Further, Section 15.11, labeled in bold "**Arbitration**," includes subsections a. through j. that fill almost an entire page of the Purchase and Sale Agreement, outlining the relevant details of the arbitration agreement.  Thus, the Court has a hard time seeing how this arbitration section was inconspicuous as Plaintiff contends.  Further, the fact that the customer has agreed to arbitration is reiterated in bold directly above the signature block at the end of the Purchase and Sale Agreement.  *See* Section 16.n.  So again, the extent of the arbitration provisions in relation to the overall length of the Purchase and Sale Agreement as well as the use of bolded headings counter Plaintiff's position that the arbitration clause is unfairly hidden in the document.  Thus, the arbitration agreement is not procedurally unconscionable.

### 2. Substantive Unconscionability

"'The substantive element of unconscionability focuses on the actual terms of the agreement and evaluates whether they create 'overly harsh' or 'one-sided' results as to 'shock the conscience.'"  *Bruni*, 160 Cal. App. 4th at 1289 (*quoting Aron*, 143 Cal. App. 4th at 808).  Because Plaintiff has failed to demonstrate procedural unconscionability, the Court need not evaluate the presence of substantive unconscionability.  However, the Court proceeds to point out that substantive unconsionabilty is also absent from the arbitration agreement.

The two primary substantive unconscionability arguments raised by Plaintiff are that the arbitration agreement will significantly limit his ability to access discovery and that MDC is more likely to sue than be sued, thus the provision is only for MDC's benefit.  Both arguments fail.

As to discovery, Plaintiff contends that if he is forced to arbitrate under the rules of JAMS, he will not be able to obtain the necessary documents from MDC or third parties, propound interrogatories, or take necessary depositions.  However, the Court does not see how the rules of JAMS are "overly harsh" in this respect.  For example, under JAMS Rule 17, similar to Fed. R. Civ. P. 26(a), the parties are required to exchange "all relevant, non-privileged documents, including, without limitation, copies of all document in their possession or control on which they rely in support of their positions," as well as the "names of individuals whom they may call as witnesses...and names of all experts who may be called to testify."  JAMS Comprehensive Arbitration Rules & Procedures, Rule 17(a).  Further, Rule 17 also imposes on the parties a continuing obligation to supplement their initial disclosures as new relevant evidence is discovered.  Further, while each side is only allowed one deposition as of right, either party can request to take additional depositions from the arbitrator.  Further, unlike the case repeatedly cited by Plaintiff for his "harshness" point, *Harper v. Ultimo*, 113

Cal. App. 4th 1402, 1407 (2003), the arbitration terms here also do not limit the type of relief or amount of damages Plaintiff can seek.

Second, as to Plaintiff's one-sided point, the Court again does not find an adequate showing of substantive unconscionabiltiy.  To begin, the agreement is not so one-sided such that only one party is required to submit his or her claims to arbitration while the other party can resort to a judicial forum.  Further, Plaintiff's point that customers will more likely be in a position to sue MDC rather than the other way around is not entirely clear, considering volatile market conditions that may result in MDC customers failing to pay balances on their accounts.  As Plaintiff's point out, an inquiry into one-sidedness also requires the court to examine if there is an adequate justification for it. *Armendariz v. Found. Health Psychare Serv.*, 24 Cal. 4th 83, 117-118 (*quoting A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 487 (1982)).  The Court agrees with Defendants that the general considerations of efficiency and economy supporting arbitration also constitute a justification for arbitration as to the current claim of one-sidedness.  Customers of MDC, through arbitration, have an ostensibly faster and cheaper means to pursue any claims against MDC.  Thus, Plaintiff has failed to show that the arbitration agreement here is either procedurally or substantively unconscionable.

## IV.    DISPOSITION

For the foregoing reasons, the Motion to Compel Arbitration and Stay this Action is hereby GRANTED.  The parties shall immediately notify this Court when the arbitration has concluded.

The Clerk shall serve this minute order on all parties to the action.